MASSACHUSETTS FOOD ASSOCIA-
TION, Roche Bros. Supermarkets, Inc.,
The Stop & Shop Supermarket Compa-
ny, Packaging Center, Inc., BJ's Whole-
sale Club, Inc., Mormax Corporation,
The Edwin R. Sage Company, Inc., Trad-
er Joe's Co. and Trader Joe's East, Inc.,
Plaintiffs,

v.

Walter J. SULLIVAN, Chairman, and Su-
zanne Iannella and Frederick W. Riley,
Individually in their Representative and
Official Capacities as Members of the
Massachusetts Alcoholic Beverages Con-
trol Commission, Defendants.

No. Civ.A. 98–11175–DPW.

United States District Court,
D. Massachusetts.

Jan. 6, 1999.

Howard Wayne, Eugene R. Richard, Wayne, Richard, Hurwitz & McAloon, Boston, MA, Robert D. Paul, White & Case, Washington, DC, Alan L. Kovacs, Bass, Doherty & Kovacs, P.C., Boston, MA, J. Mark Gidley, White & Case, LLP, Washington, DC, for plaintiffs.

Jane L. Willoughby, Attorney Generals Office, Government Bureau, Boston, MA, for Massachusetts Alcoholic Beverages Control Commission, Walter Sullivan, Suzanne Iannella, and Frederick Riley.

Louis Cassis, Quincy, MA, Ernest Gellhorn, Washington, DC, for Wine & Spirits Wholesalers of Massachusetts, Inc. and MA Wholesalers of Malt Beverages, Inc.

Bruce A. Singal, Donoghue, Barrett & Singal, PC, Boston, MA, William C. Athanas, Donoghue, Barrett & Singal, Boston, MA, for Massachusetts Package Stores Association.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The Massachusetts Food Association and several retail chains have brought this suit against the members of the Massachusetts Alcoholic Beverages Control Commission challenging the legality and constitutionality of a portion of Mass.Gen.Laws ch. 138, § 15. The plaintiffs assert that section 15's directive restricting to three the number of retail liquor licenses that any one individual or entity can possess in Massachusetts violates the federal Sherman Antitrust Act and therefore is invalid under the Supremacy Clause of the United States Constitution. The defendants have moved to dismiss for failure to state a claim upon which relief can be granted, principally because § 15 represents unilateral state action beyond the reach of the federal antitrust laws. Meanwhile, the Wine & Spirit Wholesalers of Massachusetts, Inc., Massachusetts Wholesalers of Malt Beverages, Inc., and Massachusetts Package Stores Association have all moved to inter-

vene in the case as defendants. The intervenors seek to press a broader range of issues at the motion to dismiss stage. I will deny the motions to intervene, but will grant the defendants' motion to dismiss.

## I. THE LITIGANTS

### A. *The Plaintiffs*

The Massachusetts Food Association is a private trade association whose membership includes multi-outlet food retailers operating in Massachusetts. The remaining plaintiffs are corporations owning chains of retail stores in Massachusetts. Each corporation owns more than three stores in the Commonwealth but is restricted to only three liquor licenses. Roche Bros. Supermarkets, Inc., a Massachusetts corporation, operates 13 supermarkets in Massachusetts. The Edwin R. Sage Company, Inc., a Massachusetts corporation, operates six retail outlets in Massachusetts. The Stop & Shop Supermarket Company, a Delaware corporation, and its wholly-owned subsidiary, Packaging Center, Inc., a Massachusetts corporation, operate 93 supermarkets in Massachusetts. BJ's Wholesale Club, Inc., a Delaware corporation, and its wholly-owned subsidiary, Mormax Corporation, a Massachusetts corporation, operate 13 retail outlets in Massachusetts. Trader Joe's Co., a California corporation, and its wholly-owned subsidiary, Trader Joe's East, Inc., a Massachusetts corporation, operate six retail outlets in Massachusetts. For the latter three sets of plaintiffs, the parent company and subsidiary are restricted to a combined total of three retail liquor licenses in Massachusetts.

### B. *The Defendants*

The defendants are the individual members of the Massachusetts Alcoholic Beverages Control Commission (hereinafter "the Commission"), sued only in their representative and official capacities.[1] The Commission, a state agency created by Mass.Gen. Laws ch. 6, § 43, supervises "the conduct of the business of manufacturing, importing, exporting, storing, transporting and selling alcoholic beverages." Mass.Gen.Laws ch. 6,

§ 44. The Commission submits each year "recommendations for such legislation as it deems necessary or desirable for the better regulation and control of such traffic [of alcoholic beverages] and for the promotion of temperance in use of such beverages." *Id.*

### C. *The Proposed Intervenors*

Two separate groups have moved to intervene as defendants in this action. The first group, Massachusetts Package Stores Association (hereinafter "MassPack"), is a trade association composed primarily of individual retail package stores. MassPack represents these retail stores "on legislative and regulatory matters, especially those relating to control of the sale of alcohol and the maintenance of public welfare and safety." (Mem. of Law in Supp. of Mass. Package Stores Ass'n's Mot. to Intervene as of Right at 2.) One retail liquor store actually owned by plaintiff The Stop & Shop Companies, Inc. is a member of the putative defendant intervenor, MassPack.

The second group consists of Wine & Spirits Wholesalers of Massachusetts, Inc. and Massachusetts Wholesalers of Malt Beverages, Inc. (hereinafter, collectively "the Wholesalers"). These two organizations are trade associations for wholesalers of alcoholic beverages operating in the Commonwealth. Wholesalers must be licensed by the state under Mass.Gen.Laws ch. 138, § 18. Retailers licensed under § 15 may only buy alcohol from wholesalers licensed under § 18. Mass. Gen.Laws ch. 138, § 18.

## II. THE MOTIONS TO INTERVENE

At the outset, I must address the roles of MassPack and the Wholesalers in this litigation. MassPack and the Wholesalers have each moved to intervene as of right under Fed.R.Civ.P. 24(a)(2). In the alternative, should I decide they are not entitled to intervene as of right, they request permissive intervention under Fed.R.Civ.P. 24(b)(2).

### A. *Intervention as of Right*

Rule 24(a) provides that:

fendants filed a motion to dismiss on Eleventh Amendment grounds.

---

1. The plaintiffs originally sued only the Commission itself, but amended the complaint after de-

Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The First Circuit has set out a four-part test for intervention as of right under Fed. R.Civ.P 24(a)(2): (a) the application must be timely; (b) the applicant must have an interest relating to the property or transaction which is the basis of the action; (c) the applicant must be so situated that the disposition of the action may set up a practical impediment to its ability to protect that interest; (d) the applicant must show that existing parties do not adequately represent its interests. *Public Serv. Co. of New Hampshire v. Patch,* 136 F.3d 197, 204 (1st Cir. 1998); *Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 637 (1st Cir.1989).

In this case, the plaintiffs, who object to the applicants' motions to intervene, do not dispute the timeliness of the applications, nor do they present any serious opposition to the proposition that the applicants' own ability to protect any interests they may have will likely be impaired by this action. As a result, I will focus on whether the proposed intervenors have sufficient interests in the case to justify intervention and whether any such interests are adequately represented by the existing defendants.

### 1. Interests

■ While there is no definitive statement of what type of interest is required to justify intervention as of right, the First Circuit has said that "the intervenor's claim must bear a 'sufficiently close relationship' to the dispute between the original litigants," and "[t]he interest must be direct, not contingent." *Dingwell,* 884 F.2d at 638 (citations omitted). The interest must also be "significantly protectable." *Patch,* 136 F.3d at 205 (quoting *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971)).

The proposed intervenors in this case claim essentially economic interests. The First Circuit in *Conservation Law Found. of New England, Inc. v. Mosbacher,* 966 F.2d 39, 43–44 (1st Cir.1992), held that the economic interests of fishermen were sufficient to justify intervention in a suit by environmental advocacy groups against officers of a federal agency proposing to enter into a consent decree concerning regulation of the fishing industry. The court reasoned that altering the regulations would change the economic circumstances of the fishing groups, and "[t]hese interests are not speculative simply because the explicit terms of the consent decree do not implement those changes, but merely begin a process through which they would come about." *Id.* at 43. As a result, a group may have interests sufficient to intervene in a suit concerning regulations which directly affect the group economically even if the regulations do not explicitly refer to that group. *See also New York Pub. Interest Research Group, Inc. v. Regents of Univ. of State of New York,* 516 F.2d 350, 351–52 (2d Cir.1975) (pharmacists' association had a sufficient interest to intervene in a suit by consumers to enjoin university regents from enforcing a state regulation prohibiting advertisement of prices of prescription drugs).

However, the First Circuit has more recently cautioned that, while potential economic harm is an important factor in determining whether there is a sufficient interest, "[i]t is settled beyond peradventure ... that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right." *Patch,* 136 F.3d at 205. In *Patch,* consumer groups sought to intervene in an action by utility companies against the state public utilities commissioners, asserting that the disposition of the case challenging the commission's plan would affect consumers' utility rates. The court found that an interest in lower utility rates was too general to be the basis for intervention, because it was an interest common to every consumer and business in the state. *Id.* The court also found this interest to be overly contingent, because "numerous market variables will impact New Hampshire electric

rates even after the PUC implements a re-structuring plan," and "[w]hether interaction of these variables actually will produce lower rates is anybody's guess." *Id.* at 205–06.[2]

Applying First Circuit teachings to this case, I find that the Wholesalers have not set out an interest sufficient to justify interven-tion as of right. The Wholesalers assert that Mass.Gen.Laws ch. 138, § 15 is part of a comprehensive scheme regulating the sale of liquor in the Commonwealth. They argue that because this scheme authorizes retailers to buy liquor only from authorized wholesal-ers, a change in the regulation of retailers will affect the Wholesalers economically.[3] The Wholesalers further speculate that § 15 helps to maintain an orderly market, and disruption of this order will disrupt their businesses and will undermine the promotion of temperance in the interest of public health and safety. Any speculative interest that the Wholesalers have in public health and safety in this connection is, however, identical to the interests of the Commonwealth, and there-fore, under *Patch,* not sufficient. The Wholesalers' remaining interests are all es-sentially economic in nature.[4]

The Wholesalers' economic interests in this case are simply too general and too contin-gent to be sufficient. To be sure, the Whole-salers' interests are not quite as general as those of the consumer groups in *Patch* which were shared by all consumers of electricity in the state. Nonetheless, § 15 does not ad-dress the Wholesalers at all; it merely af-fects a broad market in which they play a separate part. The Wholesalers will not nec-essarily be more directly affected by the outcome of this case than anyone else in-volved in liquor production and sales in Mas-sachusetts, potentially including consumers. Allowing anyone to intervene in this or any other case who in some sense may be affect-ed by a change in the challenged statute—regardless of whether that party is in fact directly regulated by the statute at issue—is not a manageable way to organize litigation.

In addition, the Wholesalers' interests are entirely contingent. The effect on their busi-nesses of a change in the nature and number of retailers in the Commonwealth "is any-body's guess." *Patch,* 136 F.3d at 206. Per-haps wholesalers would benefit from more competition at the retail level or see no effect on their businesses at all. The Wholesalers have not identified anything beyond a gener-al interest in a case touching on the broadly defined commercial setting in which they participate.

█ MassPack asserts interests that are more direct. Specifically, § 15 regulates re-tailers of liquor, including the members of MassPack. Elimination of § 15's three li-cense limit will affect MassPack members themselves, potentially enabling them to get licenses for more than three stores, and, more importantly for them, may change the number and nature of their competitors. MassPack's interest in this case is not a general one; the regulation in question gov-erns its members directly, and their interests are different from those of the general public

---

**2.** It bears noting that the district court in *Patch* permitted several utility companies not in the suit originally to intervene because the changes in the state's utility plan at issue in the case would directly affect their business. *Public Serv. Co. of New Hampshire v. Patch,* 173 F.R.D. 17, 27 (D.N.H.1997), *aff'd,* 136 F.3d 197 (1st Cir.1998). The First Circuit did not address these rulings in affirming the district court's denial of interven-tion to the consumer groups and other parties.

**3.** The Wholesalers' argument that, if this court rules for the plaintiffs, it would have to strike all of § 15, rather than just the three license limit, is both incorrect and irrelevant to this discussion. As Judge Wolf recently observed, state law gov-erns the severability of a state statute, and under Massachusetts law, if a court finds a part of a statute to be unconstitutional, the court should find the remainder of the statute constitutional and valid as far as possible if the remaining parts are severable. *Canterbury Liquors & Pantry v. Sullivan,* 999 F.Supp. 144, 147 (D.Mass.1998). Here, the remainder of § 15 is clearly severable. Furthermore, even if all of § 15 were to be struck, the Wholesalers would still not have a sufficient interest because no part of the section is directly relevant to the Wholesalers' busi-nesses.

**4.** The Wholesalers' reply memorandum simply elaborates on their asserted economic interests in the case, premised on the fact that eliminating the three license limit on retailers would have industry-wide effects. Their claim that such a change could endanger family-owned businesses which have benefitted the community in civic and charitable ways (*Id.* at 5) is simply another—and quite conjectural—way of stating a potential economic harm.

or of any businesses outside of the liquor retail sector. Indeed, "preserving the right of small, independent liquor dealers to do business" is one of the recognized purposes of the three license restriction. *Johnson v. Martignetti,* 374 Mass. 784, 792, 375 N.E.2d 290 (1978).

The plaintiffs' contention that MassPack's interest is not protectable because it is anticompetitive does not affect intervention analysis. MassPack is not seeking protection under the antitrust laws, which, as the plaintiffs assert, cannot be used for anticompetitive purposes. Rather, MassPack is seeking to preserve a state regulatory statute which it claims benefits its members and which may in part be intended to benefit its members. The plaintiffs are essentially inviting me to presume that § 15 violates antitrust principles for the purposes of this motion to intervene. I make no such presumption at this time.

Even though § 15 regulates retailers directly, it is not immediately clear whether the economic interest MassPack's member retailers have in this case is direct or contingent. The plaintiffs argue that the economic effect of a rejection of the three license limit on MassPack members, like that on the Wholesalers, "is anybody's guess." *Patch,* 136 F.3d at 206. MassPack members could potentially even benefit from such a change, setting up additional retail stores themselves. More likely, however, the entry of more and larger competitors into the retail liquor market will have a negative economic effect on some small retail operations. The interest in economic security seems direct and concrete enough to find that MassPack has a sufficient interest in the case for intervention purposes.

### 2. Adequate Representation

■ By contrast, I find that MassPack's interests are adequately represented by the Commonwealth in this case.[5] Of course, "[a]n intervenor need only show that representation may be inadequate, not that it is inadequate." *Mosbacher,* 966 F.2d at 44; *Trbovich v. United Mine Workers,* 404 U.S.

528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). However, while an applicant for intervention "need only make a minimal showing" of inadequacy, "the adequacy of interest requirement is more than a paper tiger. A party that seeks to intervene as of right must produce some tangible basis to support a claim of purported inadequacy." *Patch,* 136 F.3d at 207.

■■ The applicants for intervention in this case run up against two basic presumptions of adequate representation. The First Circuit in *Patch* held that commissioners defending an action in their capacity as members of a representative governmental body are presumed to represent the interests of their constituents adequately. *Id.* This presumption applies in the current case as well, because the defendants are commissioners appointed by the governor and here sued in their representative capacity. To rebut this presumption "requires 'a strong affirmative showing' that the agency (or its members) is not fairly representing the applicant's interests." *Id.* (citation omitted). More generally, "[w]here the party seeking to intervene has the same ultimate goal as a party already in the suit, courts have applied a presumption of adequate representation." *Moosehead Sanitary Dist. v. S.G. Phillips Corp.,* 610 F.2d 49, 54 (1st Cir.1979). Here, the proposed intervenors and the original defendants have precisely the same goal—defending the validity of the three license limit on retailers of liquor.

■ To overcome this latter presumption, an applicant for intervention traditionally had to show "adversity of interest, collusion, or nonfeasance." *Id.* The First Circuit has also recognized that evidence that the original parties are "sleeping on their oars" or are engaged in settlement talks may be enough to show inadequate representation. *Mosbacher,* 966 F.2d at 44; *Moosehead,* 610 F.2d at 54–55.

The applicants for intervention have some basis for arguing that they overcome these

---

5. Even if the Wholesalers did have a sufficient interest to justify intervention as of right, I would deny them intervention as of right because their interests are also adequately represented by the Commonwealth. The same reasoning I use in discussing this issue in relation to MassPack applies equally to the Wholesalers.

presumptions. MassPack's members are retailers specifically regulated by the Massachusetts Alcoholic Beverages Control Commission. (The Wholesalers are similarly regulated by the Commission, albeit not under § 15.) The district court in *Patch* held that a regulatory commission and the subjects of its regulation are in "a traditionally adversarial relationship" sufficient to overcome the presumption of adequacy. *Public Serv. Co. of New Hampshire v. Patch,* 173 F.R.D. 17, 28 (D.N.H.1997), *aff'd,* 136 F.3d 197 (1st Cir.1998).[6] Several other courts have reached a similar conclusion, contending, as the applicants for intervention do here, that a governmental agency's need to represent the public interest conflicts with its representation of members of the industry it regulates. *See Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Department of Interior,* 100 F.3d 837, 845 (10th Cir.1996); *NYNEX Corp. v. Federal Communications Comm'n,* 153 F.R.D. 1, 3 (D.Me.1994).

First Circuit precedent, however, suggests that this potential divergence of interests by itself is insufficient to overcome the dual presumptions of adequate representation present in this case. In *Patch,* the First Circuit found that the applicants for intervention had suggested no legal arguments that the government agency could not or would not make. *Patch,* 136 F.3d at 208. Further, the *Patch* court noted that the governmental defendants in that case had "launched a full-scale uncompromising defense." *Id.* Here, also, the defendants have launched a vigorous defense, including two motions to dismiss at the outset. The defendants appear to be willing and able to present all defenses that the proposed interve-

nors could advance.[7] "This circumstance, in itself, weighs heavily in favor of denying mandatory intervention." *Id.; accord International Bhd. of Teamsters v. J.F. Partyka & Son, Inc.,* 176 F.R.D. 429, 432 (D.Mass. 1997) (finding that the fact that a union has energetically pursued the grievance in question supports a finding of adequate representation).

Indeed, as Judge Keeton has observed, the First Circuit generally finds inadequate representation by a governmental agency only when that agency fails to pursue a case wholeheartedly or when its interests diverge in fact from the proposed intervenors' interests. *Resolution Trust Corp. v. City of Boston,* 150 F.R.D. 449, 454 (D.Mass.1993); *see Mosbacher,* 966 F.2d at 44 (inadequate representation found where governmental defendant did not file an answer to the complaint, instead signing a consent decree agreeing to most of the relief sought); *Moosehead,* 610 F.2d at 49 (adequate representation found when sanitary district's attorneys were not "sleeping on their oars"). Where, as here, the original defendants have defended the case vigorously, "a logical possibility of divergence, without any indication of actual divergence, does not suffice for the purposes of intervention of right." *Resolution Trust Corp.,* 150 F.R.D. at 454.

The First Circuit, in looking at adequacy of representation, considers three additional factors: (1) whether the interests of the present party are sufficiently similar to the applicants' interests that the present party will definitely make the applicants' legal arguments, (2) whether the present party is willing and able to make those arguments, and (3) whether the applicants, if allowed to

---

**6.** The district court made this statement in the course of its decision to allow several utility companies to intervene. Because the grant of intervention rights to those parties was not appealed, the First Circuit did not address this issue.

**7.** To be sure, there are apparent in the submissions of the defendants and those of the proposed intervenors differences of emphasis presumably as a result of somewhat different views regarding the issues to be pressed at the motion to dismiss stage. The defendants—unlike the Wholesalers who offer a full argument—treat the 21st Amend-

ment question only in a footnote and do not treat at length, as the Wholesalers do, the question of whether ownership limitations constitute a per se antitrust violation; nor do the defendants argue separately and extensively, as both the wholesalers and MassPack do, the question of *Parker v. Brown* immunity. As my disposition of the motion to dismiss suggests, the choice by the defendants of issues to present at the motion to dismiss stage appears sound. The additional arguments the proposed intervenors pressed at this stage appear more appropriate for consideration after some factfinding, if that were necessary.

intervene, would add some necessary element to the case. *United Nuclear Corp. v. Cannon*, 696 F.2d 141, 145 (1st Cir.1982).

Here, the applicants for intervention point to very little of significance that they can add to this case. MassPack argues that it will bring the perspective of its members, who have a potential economic stake in the continuation of the three license limit, which is different from the public interest-oriented perspective that the Commission members will bring. However, the issues in this case are almost exclusively legal issues to be decided based on judicial construction of statutes and the constitution; different sets of facts or different perspectives on the part of the litigants will change little in the arguments before the court. The proposed intervenors, particularly the Wholesalers, also question the brevity of the original defendants' treatment of certain legal issues and their failure to mention certain important cases in their memorandum supporting their motion to dismiss. However, where the Commission members are aggressively pursuing their defense in general and at this stage appear to have at least identified the potential defenses, *see* note 7 *supra*, I will not find that strategic differences, different uses of caselaw or a welcome conciseness in presentation to be grounds for a finding of inadequate representation.[8]

Overall, it appears that MassPack must rely on the inherent adversity between regulators and those they regulate as its basis for a finding of inadequate representation. Because that adversity appears to have little relevance to the argument of this case and because of the First Circuit's strong presumptions of adequate representation when parties have the same ultimate goal and when a governmental organization is the existing party, I find that neither MassPack nor the Wholesalers has established that the named defendants will inadequately represent its interests. As a result, I conclude neither MassPack nor the Wholesalers is entitled to intervention as of right.

### B. Permissive Intervention

Both MassPack and the Wholesalers ask that they be permitted to intervene pursuant to Fed.R.Civ.P. 24(b)(2) in the event that they are denied intervention as of right. Fed.R.Civ.P. 24(b) states in relevant part:

> Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

District courts have "broad discretion" in deciding whether or not to grant permissive intervention under Fed.R.Civ.P. 24(b)(2). *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 641 (1st Cir.1989). The First Circuit has pointed to three factors that can make permissive intervention appropriate, two of which come directly from the statute: "(1) 'the applicant's claim or defense and the main action have a question of law or fact in common;' (2) the applicant's interests are not adequately represented by an existing party; and (3) intervention would not result in undue delay or prejudice to the original parties." *In re Thompson*, 965 F.2d 1136, 1142 n. 10 (1st Cir.1992).

Here, the applicants wish to present essentially the same defense as the existing defendants, so they clearly fulfill the first prong of this test. However, as explained at length above, the applicants have not shown that the Commission members do not adequately rep-

---

8. The Wholesalers also point out that when another liquor regulation was recently struck down in *Canterbury Liquors & Pantry v. Sullivan*, 16 F.Supp.2d 41 (D.Mass.1998), the Attorney General declined to appeal the decision. The case went on to the First Circuit only because the Wholesalers, who had intervened as defendants, appealed. The First Circuit, however, decided that the Wholesalers lacked standing to bring an appeal. *Sea Shore Corp. v. Sullivan*, 158 F.3d 51 (1st Cir.1998). The court concluded that where a defendant "intervenor does not receive a direct benefit from a reversal of the decision below, it is not 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Id.* at 58 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). It is by no means clear that the Wholesalers could make any more substantial show of standing here if I were to rule for the plaintiffs.

resent their interests. This failure diminishes the case for permissive intervention.

As discussed above, MassPack and the Wholesalers would add very little to this case. This is not a fact-based dispute, so different facts, opinions and perspectives are of relatively limited assistance to the court. Similarly, the applicants for intervention do not appear to have different legal arguments. They would simply provide new case citations and would make the different strategic choice of raising the 21st Amendment issue now, rather than noting it and reserving it for the future, as the existing defendants have. MassPack and the Wholesalers have "presented no creditable argument that [their] status as [ ] intervenor-defendant[s] would in any way reshape the issues in this case or contribute to its just resolution." *Resolution Trust Corp.*, 150 F.R.D. at 455. And despite their protestations to the contrary, MassPack and the Wholesalers would, if brought into this lawsuit, inevitably increase the demands of case management for the court and the other parties. I conclude that they would contribute little more to this case than alternatively phrased legal arguments. This they can do through their present role as amici curiae. Because they have "not shown any justification for the delay and added demands on resources of the court and the parties that [their] intervention would be likely to cause," *id.*, I will exercise my discretion and deny the applicants' requests for permission to intervene.

### III. THE MOTION TO DISMISS

In reviewing a motion to dismiss, I "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (citing *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir.1992)). However, I "will not accept a plaintiff's unsupported conclusions or interpretations of law." *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 (1st Cir.1995). Furthermore, I may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus.*, 814 F.2d 22,

25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Applying this standard, I address only two legal issues: whether the allegation that Mass.Gen.Laws ch. 138, § 15 sets out a per se violation of the antitrust laws is sufficient and whether, even if § 15 involves a per se antitrust violation, the statute constitutes unilateral state action beyond the reach of the federal antitrust laws. Because after consideration of these two issues I find dismissal is appropriate, I need not reach the two additional grounds for dismissal argued at greater length by the proposed intervenors, whom I treat as amici curiae: whether the challenged restriction qualifies for state action immunity and whether the Twenty-first Amendment protects the statute even if it violates federal antitrust law.

### A. Does § 15 Establish a Per Se Antitrust Violation?

■ The plaintiff specifically challenges the portion of Mass.Gen.Laws ch. 138, § 15 which provides with reference to liquor retail licenses, "No person, firm, corporation, association, or other combination of persons ... shall be granted, in the aggregate, more than three such licenses in the commonwealth." They assert that this restriction facially conflicts with the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and is therefore preempted under the Supremacy Clause of the United States Constitution.

The Supreme Court has held that:

a state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a per se violation.

*Rice v. Norman Williams Co.*, 458 U.S. 654, 661, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). A statute's adverse effect on competition is not enough to trigger preemption; indeed,

the states would be crippled in their efforts to engage in any economic regulation if it were. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

The defendants have suggested that the conduct mandated by § 15 might not constitute a per se violation even if engaged in by agreement of private parties, but they do not press this as a grounds for dismissal.[9] Nonetheless, I will briefly consider whether the allegation that § 15 constitutes a per se violation of the antitrust laws such that it may be subject to preemption.

Per se violations are those that "are so 'plainly anticompetitive' and so often 'lack . . . any redeeming virtue' that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (internal citations omitted). They are agreements which "so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances," *NYNEX Corp. v. Discon, Inc.*, — U.S. —, —, 119 S.Ct. 493, 497, 142 L.Ed.2d 510 (1998). In general, "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations." *Broadcast Music*, 441 U.S. at 9, 99 S.Ct. 1551 (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)).

Plaintiffs argue that § 15 is an output restriction, fitting it into a common category of per se violation. In *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the Supreme Court found that the NCAA's restriction on the number of football games member universities could televise "create[d] a limitation on output; our cases have held that such limitations are unreasonable restraints of trade." *Id.* at 99, 104 S.Ct. 2948. At first blush, § 15's restriction on the number of retail liquor licenses a

company may possess appears to have characteristics similar to the NCAA's restriction on the number of football games schools may televise and to other output restrictions found to be per se violations of the Sherman Act.

However, § 15 is not a traditional limitation on output. In restricting the number of retail stores any individual or company may own, Massachusetts is not necessarily limiting the total number of liquor retail stores or the total amount of liquor sold in the Commonwealth. It may be viewed as simply spreading this output among more retailers. Furthermore, since a restriction on the number of stores an individual entity may own is different from traditional output restrictions which directly limit the amount of a product that individuals may sell, it is by no means clear that the three license ownership limit fits into a category of restriction about which courts have "considerable expertise" and so can classify as a per se violation. Nor is it clear that the statute places irresistible pressure on private parties to violate the antitrust laws.

Nonetheless, at this stage, I find that the plaintiffs' pleadings establish a sufficient possibility of a per se violation to survive a motion to dismiss. Section 15 may in fact have the effect of limiting output in a way that would necessarily be impermissible under the Sherman Act if engaged in by private parties. Without further factual development, it is difficult not to characterize § 15's three license ownership limit as a practice which "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music*, 441 U.S. at 19–20, 99 S.Ct. 1551. Certainly, the intent of § 15 is to dampen output by regulating sales and encouraging temperance:

> Concentration of retailing in the hands of an economically powerful few has been thought to intensify the dangers of liquor sales stimulations, thereby threatening trade stability and promotion of temperance. Regulation of the number of licenses issued, therefore, aims at controlling the

---

**9.** As noted, the wholesaler amici press this point more forcefully.

tendency toward concentration of power in the liquor industry; preventing monopolies; avoiding practices such as indiscriminate price cutting and excessive advertising; and preserving the right of small, independent liquor dealers to do business. *Johnson v. Martignetti,* 374 Mass. 784, 792, 375 N.E.2d 290 (1978). As a result, I would not deprive the plaintiffs, solely on these pleadings, of the chance to develop a record supporting the proposition that the three license limit is a per se violation which is plainly anticompetitive and lacks redeeming virtue.

### B. Does § 15 Constitute Unilateral State Action Immune from the Antitrust Laws?

██ Although I will accept at this stage the proposition that the plaintiffs have adequately pled that the three license restriction would have constituted a per se violation if it had been the product of private concerted action, defendants may still prevail if § 15 constitutes unilateral state action. The federal antitrust laws do not apply to unilateral state action, so plaintiffs have not presented a colorable claim, and the action must be dismissed.

Section 1 of the Sherman Act "reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy' between separate entities. It does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (quoting *Albrecht v. Herald Co.,* 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968)). In *Fisher v. City of Berkeley,* 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), the Supreme Court applied this princicipal to a municipal rent control ordinance, holding that laws unilaterally imposed by the government are outside of the Sherman Act and so cannot be in impermissible conflict with it. *Id.* at 266–67, 106 S.Ct. 1045. The Court further held that the fact that property owners obeyed the statute did not create a combination or conspiracy between the city and the property owners or among the property owners. *Id.* at 267, 106 S.Ct. 1045. Thus, the fact that retailers in Massachusetts

obey the three license limit set out by § 15 does not create a conspiracy.

To be sure, the Court in *Fisher* found that some government-imposed restraints do not constitute unilateral action outside the scope of § 1 of the Sherman Act. These the Court characterized as "hybrid" restraints. *Id.* at 267–68, 106 S.Ct. 1045. Under a hybrid restraint, "nonmarket mechanisms merely enforce private marketing decisions," such that "private actors are thus granted 'a degree of private regulatory power.'" *Id.* at 268, 106 S.Ct. 1045 (citation omitted). *Fisher* referenced two previous cases in which the Supreme Court had invalidated statutes because they constituted hybrid restraints. Examination of those and related cases is useful in determining whether § 15 is a hybrid restraint.

In *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), the Court struck down as contrary to the Sherman Act a Louisiana law which allowed liquor distributors and retailers to make contracts fixing retail prices and then prevented any retailer, whether or not a party to the contract, from selling at less than the prices stipulated in such a contract. *Id.* at 386–90, 71 S.Ct. 745. Similarly, in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court invalidated a regulation which provided that wine prices posted by a single wholesaler would be binding upon all wholesalers within a designated trading area. *Id.* at 99–100, 103, 100 S.Ct. 937. In both of these cases, the contested statute gave a private party the power to set prices which the state then enforced as to that party and others. It was this private regulatory power that made these statutes impermissible hybrid restraints.

Judge Wolf recently found that a Massachusetts statute that allowed wine wholesalers to set prices and then held them to those prices for a month without any review by the state as to the reasonableness of the price constituted just such a hybrid restraint in violation of the Sherman Act. *Canterbury Liquors & Pantry v. Sullivan,* 16 F.Supp.2d 41, 45–46 (D.Mass.1998), *appeal dismissed*

*sub nom. Sea Shore Corp. v. Sullivan,* 158 F.3d 51 (1st Cir.1998). *See also Miller v. Hedlund,* 813 F.2d 1344, 1351 (9th Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988) (invalidating as hybrid a similar Oregon statute).

The restriction challenged here, however, is quite different. It does not cede price setting power to private parties without state review. Section 15 gives private retailers no discretion as to the maximum number of retail licenses they may obtain. Instead, the statute unilaterally sets the limit on liquor retail licenses at three. The retailers governed by this limit may properly do nothing but obey it. Section 15 resembles the ordinance in *Fisher,* which dictated the specific rent ceilings property owners must follow. *Fisher,* 475 U.S. at 269, 106 S.Ct. 1045. As in *Fisher,* the contested statute here lacks the requisite concerted action to trigger § 1 of the Sherman Act.

Plaintiffs argue that § 15 is in fact a hybrid regulation because it restricts one element of competition, while giving retailers discretion to determine the location, size and output of their retail stores. I find, however, that any discretion as to the size and nature of retail stores is wholly collateral to § 15's three license ownership limit.[10] Plaintiffs have not challenged regulations governing the location, size or output of retail stores; they have only challenged the limit on the number of licenses an individual can hold. As to that limit, retailers have no discretion. This places § 15 in similar posture as the ordinance in *Fisher,* which set limits on the rent landlords could charge but left to the landlords' discretion the location and nature of the property they could rent out.[11]

10. Defendants vigorously contest this assertion, pointing to numerous statutory controls as to the number and nature of liquor retail stores. I need not address this dispute because the provision challenged here, irrespective of residual discretion as to collateral questions of location, size and output, is unilateral state action simpliciter.

11. The plaintiffs look to *Hertz Corp. v. City of New York,* 1 F.3d 121 (2d Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1054, 1055, 127 L.Ed.2d 375 (1994) for support. In *Hertz,* a rental car company challenged a city statute which prohibited rental car companies from charging differential fees based on a customer's residence. *Id.* at 124. The Second Circuit found

Applying *Fisher* and comparing § 15 to the statutes struck down in *Midcal* and *Schwegmann,* I find the contested portion of § 15 to be unilateral state action outside the scope of § 1 of the Sherman Act. Because § 15 has survived the "first level preemption inquiry of *Rice,*" I need not explore the next sequential level: whether *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), state action immunity is available to defend the statute. *See generally,* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 217c, at 315 (rev. ed.1997).

## V. CONCLUSION

For the reasons set forth more fully above, the motions of MassPack and the Wholesalers to intervene as defendants are DENIED, and the motion of the defendants to dismiss for failure to state a claim is GRANTED.

New York City's law to be a hybrid restraint in violation of the Sherman Act "because it removes one element of competition in car-rental pricing, but does not further regulate or review the prices set by rental companies."

I find the reference to *Hertz* unpersuasive. As a leading commentary on antitrust law observes, "The ordinance in *Hertz* did not give any private actor the discretion to impose any kind of restraint at all; as a result, its analysis is fundamentally inconsistent with [governing Supreme Court precedent]." 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 217c, at 319 (rev. ed.1997).