MASSACHUSETTS FOOD ASSOCIATION, et al., Plaintiffs, Appellants,

v.

MASSACHUSETTS ALCOHOLIC BEVERAGES CONTROL COMMISSION, et al., Defendants, Appellees.

Massachusetts Food Association, et al., Plaintiffs, Appellees,

v.

Massachusetts Alcoholic Beverages Control Commission, et al., Defendants, Appellees,

and

Wine & Spirit Wholesalers of Massachusetts, Inc., et al., Appellants.

Nos. 99–1277, 99–1280.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1999.

Decided Dec. 2, 1999.

J. Mark Gidley with whom Robert D. Paul, J. Christian Word, White & Case LLP, Alan L. Kovacs, Howard J. Wayne, Eugene R. Richard and Wayne, Richard, Hurwitz & McAloon, were on brief, for plaintiffs.

Jane L. Willoughby, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, and Thomas A. Barnico, Assistant Attorney General, were on brief, for defendants.

Bruce A. Singal with whom William C. Athanas, Donoghue, Barrett & Singal, P.C., Louis A. Cassis, Cassis, Arena & Cayer and Ernest Gellhorn, were on brief, for intervenor, appellants Wine & Spirit Wholesalers of Massachusetts, Inc., et al.

Bruce A. Singal, William C. Athanas, Donoghue, Barrett & Singal, P.C., Louis A. Cassis, Cassis, Arena & Cayer and Ernest Gellhorn, on brief, for Massachusetts Package Stores Association, Inc., Wine & Spirits Wholesalers of Massachusetts, and Massachusetts Wholesalers of Malt Beverages, Inc., Amici Curiae.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

BOUDIN, Circuit Judge.

Massachusetts, like many other states, extensively regulates the sale of alcoholic beverages. Among other restrictions, retail outlets must be licensed, each license embraces only a single location, and no firm or person is allowed "more than three such licenses in the commonwealth...." Mass. Gen. Laws ch. 138, § 15 (1998). Thus, no one can own more than three retail liquor stores in the Commonwealth. Although some state regulations also impinge on retail prices, e.g., Mass. Gen. Laws ch. 138, § 25C, they are not at issue here.

The plaintiffs in this case—who include several supermarket chains—brought this action in the district court to enjoin en-

forcement of the three-store limit. The complaint charged that this statutory restriction conflicted with the Sherman Act, 15 U.S.C. § 1, *et seq.*, because it would be a *per se* violation of the Sherman Act for private competitors to agree with each other to impose such a limitation. The complaint further alleged that the defendants, the members of the Massachusetts Alcoholic Beverages Control Commission, lacked power to supervise, and did not in fact supervise, the anticompetitive consequences of this limitation (*i.e.*, less competition and higher prices).[1]

Several organizations moved to intervene to defend the statute. One of them, the Massachusetts Package Stores Association ("MPSA"), is a trade association primarily representing retail liquor stores. The other two organizations—The Wine & Spirits Wholesalers of Massachusetts and the Massachusetts Wholesalers of Malt Beverages—are trade associations for alcoholic beverage wholesalers in Massachusetts. All three entities sought to intervene as of right or, in the alternative, as permissive intervenors. Fed.R.Civ.P. 24(a)(2), (b)(2). The Commission and its members moved to dismiss the complaint for failure to state a claim. Fed.R.Civ.P. 12(b)(6). After briefing and argument, the district court, on January 6, 1999, denied intervention to the trade associations but granted the defendants' motion to dismiss. *Massachusetts Food Ass'n v. Sullivan,* 184 F.R.D. 217, 228 (D.Mass.1999).

The plaintiffs in the district court now appeal from the dismissal of their complaint. The trade associations that sought to intervene appeal from the denial of intervention (but in an amicus brief support the dismissal of the complaint). Our review of the judgment of dismissal is *de novo. Rogan v. Menino,* 175 F.3d 75, 77 (1st Cir.), *cert. denied,* — U.S. —, 120 S.Ct. 616, — L.Ed.2d — (1999). Since we affirm the judgment of dismissal,

the intervention issue is largely (although not entirely) academic, and we return to it only after addressing the merits.

At first blush, one might think this a strange complaint. The state statute limiting retail liquor outlets looks like a garden-variety act of local legislation limiting the number of licenses that the state will grant, and the statute neither authorizes nor directs private parties to engage in anticompetitive agreements among themselves. Putting aside the special status of state liquor regulation under the Twenty–First Amendment, U.S. Const. amend. XXI, § 2, one of the best settled rules in antitrust law is that the Sherman Act was not intended to "apply" to the states so as to foreclose otherwise valid state regulation. *Parker v. Brown,* 317 U.S. 341, 350–52, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *see also Neo Gen Screening, Inc. v. New England Newborn Screening Program,* 187 F.3d 24, 28 (1st Cir.), *cert. denied,* — U.S. —, 120 S.Ct. 615, — L.Ed.2d — (1999); *Tri–State Rubbish, Inc. v. Waste Management, Inc.,* 998 F.2d 1073, 1076 (1st Cir.1993). But, as we shall see, there are qualifications on this general rule, and the case law is not entirely coherent. *See generally* I Areeda & Hovenkamp, *Antitrust Law* ¶ 221 (1997). With some ingenuity, the plaintiffs in this case have sought to make the most of the resulting ambiguities.

Almost from the outset, the immunity from the Sherman Act afforded to "state action" has been hedged by a concern with state laws deemed merely to authorize or direct conduct by private parties that—absent such state legislation—would violate the antitrust laws. *Cf. Parker,* 317 U.S. at 351–52, 63 S.Ct. 307. It is one thing to say that a state may itself regulate in an "anticompetitive" fashion; it is quite another to say that the state can effectively exempt *private* parties from obeying the antitrust laws. Thus, a state

1. The complaint originally named the Commission itself as a defendant but, in response

to an Eleventh Amendment objection, the members were substituted as defendants.

cannot shield private parties from the federal antitrust laws by enacting a statute saying no more than that competing grocery stores may agree to fix prices; through the Supremacy Clause, the Sherman Act would preempt such a law.

■ This qualification is *itself* qualified. Under certain conditions, the states have been allowed to authorize or direct private conduct otherwise inconsistent with the Sherman Act. The main conditions are that the state do so as part of a deliberate policy to displace competition *and* that the state provide an alternative regime that provides "active supervision" of the conduct, *Patrick v. Burget,* 486 U.S. 94, 100, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988); an example would be a specific authorization for joint ratemaking by intrastate carriers coupled with state agency authority to require that the resulting rates be just and reasonable. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); *see* I Areeda, *supra,* ¶ 226.

What state entities can adopt such a policy (state executives? local municipalities?), how clearly the policy must be articulated, and (above all) what kind of supervision will suffice are among the issues that have provoked endless litigation. *See* I Areeda, *supra,* ¶ 226. For example, supervision may be a proxy for competition, designed to protect consumers (*e.g.,* utility regulation); but supervision is not clearly limited to cases of this character. *See, e.g., Patrick,* 486 U.S. at 100–01, 108 S.Ct. 1658 (suggesting that state supervision reinforces requirement that anticompetitive behavior at issue be consistent with the state's deliberate policy).

■ But our facts do not require an examination of clear articulation, active su-

pervision or other conditions for immunity. It is only where state legislation "would otherwise" be preempted by the Sherman Act that these further inquiries are required. *Fisher v. City of Berkeley, California,* 475 U.S. 260, 265, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). In this case, the state has not ordered or authorized private parties to engage in conduct that, absent immunity, would even arguably violate the antitrust laws; there is no private agreement or arrangement between retailers as to the number of retail outlets and therefore no violation to be shielded. The state simply insists upon licensing retail liquor stores—as it does for many businesses or professions—and limits the number of licenses to three per owner.

Despite disclaimers, the plaintiffs' case rests in the end on the implicit proposition that the Massachusetts statute is preempted because it produces an *effect* that could not be produced by agreement of private parties without violating the antitrust laws. Admittedly, private parties could not agree that each of them would operate only three such outlets. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Addamax Corp. v. Open Software Found., Inc.,* 152 F.3d 48, 51 (1st Cir.1998).[2] This resemblance in effects is the gist of the plaintiffs' position, although it is narrowed by the suggestion that preemption may be confined to statutes that produce the same effect as a *per se* violation (rather than a non-*per se* one); and, of course, plaintiffs concede that even a *per se* violation would be all right if the requisite state policy and active supervision existed.

The difficulty with this "similar effects" argument is that much direct government regulation prohibiting one form of economic activity or requiring another involves

---

2. *Topco* may no longer be good law for its broader proposition that such a restraint is condemned *per se* even where it is ancillary to a productive joint venture. *Cf. Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 20–24, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210,

224–29 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). But no one doubts that an independent agreement between private parties to limit output or divide markets is to be condemned *per se. See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990).

directives that private parties could not themselves implement without violating the antitrust laws. For example, competing shoe stores could not agree on closing hours or holidays without committing *per se* violations of the antitrust laws; nor could competing taxi companies agree on the number of taxicabs to be operated; nor could cable companies agree that only one or two of them should serve a locality. Yet all of these results are examples of commonplace state or local regulation, sometimes accompanied by local price regulation but sometimes not.

■ To allow federal judges to decide which of these legislative enactments should survive and which should be condemned comes close to reintroducing the kind of judgments that got the Supreme Court into so much trouble in the *Lochner* era. The result might well be more competition and greater consumer welfare. But it would come at the cost of second-guessing the democratically elected legislature's decisions about the proper balance between competition and other social policies that are commonly reflected in such legislation. The Sherman Act is a "charter of economic liberty," *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), but only as against *private* restraints.

■ From these examples, it is evident that one must be careful in parsing general statements to the effect that states may not compel "private parties to engage in anticompetitive behavior." *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345–46 n. 8, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). What is centrally forbidden is state licensing of arrangements between private parties that suppress competition—not state directives that *by themselves* limit or reduce competition. This is the very distinction stressed by the Supreme Court in *Fisher* where it sustained the City of Berkeley's rent control ordinance (rent control being a classic constraint on competitive pricing). As the Court there explained,

> [a] restraint imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy.

*Fisher*, 475 U.S. at 267, 106 S.Ct. 1045.

The only fact patterns that give the plaintiffs any purchase is a set of Supreme Court decisions that struck down state statutes that were deemed to direct and implement private conduct replicating resale price maintenance schemes.[3] The schemes were structured to allow one party (manufacturer or wholesaler) to set the resale price to be charged by purchasers at the next level. The resemblance in form and function to traditional private resale price maintenance, *see Dr. Miles Medical Co. v. John D. Park & Sons, Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), was so close that the Supreme Court treated the arrangements as if they were nothing other than private resale price maintenance schemes licensed and abetted by the state.

There are no private restraints in this case, whether operating alone or in conjunction with state action. *Cf. Duffy*, 479 U.S. at 345 n. 8, 107 S.Ct. 720. The Massachusetts statute limiting licenses to three per company does not authorize or direct any private agreements or permit any competitor to determine the price or location of another. The three-store limit is no more an agreement among competitors, or subordination of one competitor to the dictates of another, than a state electrical code that prescribes safety standards for

---

3. *Duffy*, 479 U.S. 335, 107 S.Ct. 720; *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

contractors who wire buildings for electricity. As in *Fisher*, the restrictions have been "unilaterally imposed by government ... to the exclusion of private control." *Fisher*, 475 U.S. at 266, 106 S.Ct. 1045.

■ Our conclusion in no way depends on the premise that the Massachusetts three-store limit serves the public interest or on the amici's dubious suggestion that the limit has no effect on price or output.[4] Whatever its purported or actual purpose, *cf. Johnson v. Martignetti*, 374 Mass. 784, 375 N.E.2d 290, 297 (Mass.1978), it is common knowledge that many statutes regulate private activities to protect the narrow economic interests of other companies, often to the detriment of the public. *See* Frank H. Easterbrook, *Antitrust and the Economics of Federalism*, 26 J.L. &. Econ. 23, 23–24 (1983). But unless such a statute licenses or commands a *private* restraint, this is a matter for the voters and not for the federal courts—at least so far as the Sherman Act is concerned. Of course, such state statutes remain subject to the constraints of the Commerce Clause and other constitutional provisions.

■ This brings us to the separate question whether MPSA and the two wholesaler trade associations should have been allowed to intervene. The district court held that the wholesalers' interests were too general and contingent to justify intervention; in the case of MPSA, whose members were subject to the very three-store regulation challenged by plaintiffs, the court said that its members did have a direct and concrete interest in defending the statute but that they were adequately represented by the Commonwealth. As for permissive intervention, the court found that all three trade associations could adequately express their views through amicus briefs.

The problem presented in this case is a common one: a private party attacks a regulatory statute or administrative rule; the state or its regulators are its defendants; and other parties having an economic interest in the validity or invalidity of the statute or regulation seek to intervene. The standard for intervention as of right is set forth in Rule 24(a)(2) as follows:

> Upon timely application anyone shall be permitted to intervene in an action: ... when the applicant claims an interest relating to the property or transaction which is the subject matter of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In such cases, the timeliness of intervention and the practical impact on the would-be intervenor are rarely in dispute: it is the "interest" and "adequately represented" criteria that are usually decisive.

Rule 24(a)(2)'s reference to "an interest relating to the property or transaction" suggests that the drafters had in mind something narrower and more akin to property or contract interests in conventional private litigation as the necessary stake; but this narrow reading has not been accepted in practice. *See Daggett v. Commission on Governmental Ethics and Election Practices*, 172 F.3d 104, 110 (1st Cir.1999). We will therefore assume that the district court was right in holding that MPSA satisfied the "interest" requirement and assume *arguendo* (and solely to shorten the opinion) that the district court was wrong in holding that the wholesalers lacked such an interest.

■ But, perhaps as a counterweight to the broad reading of "interest,"

---

4. In theory, the three-store limit might or might not affect price, depending on the extent of existing competition in specific local retail markets where (absent the limit) those who have three stores elsewhere in the Commonwealth might choose to operate. But energetic defense of the statute by MPSA is some indication that its members fear that more competition from larger chains would drive down price, improve service, or both.

the courts have been quite ready to presume that a government defendant will "adequately represent" the interests of all private defenders of the statute or regulation unless there is a showing to the contrary. *See Public Serv. Co. v. Patch*, 136 F.3d 197, 207 (1st Cir.1998). And while there are various ways to show that state representation is not adequate, the burden of overcoming the presumption is upon the would-be intervenor, *Daggett*, 172 F.3d at 111. The trial court, in applying a general rule to specific facts, is usually accorded a measure of deference in making the adequate-representation determination, so long as the court applies the proper legal standards.[5] *Id.* at 111–12.

The would-be intervenors argue that the Commonwealth cannot be an adequate representative of their interests while it also regulates them. In support of this position, they point to *Conservation Law Found. v. Mosbacher*, 966 F.2d 39 (1st Cir.1992), and the district court opinion in *Public Service Co. of New Hampshire v. Patch*, 173 F.R.D. 17 (D.N.H.1997). In *Mosbacher*, we held that commercial fishing groups could intervene as of right to oppose a challenge to a state agency's approval of a fishery plan, noting that the fishing groups were regulated by the agency. *Mosbacher*, 966 F.2d at 44. In *Patch*, the district court allowed intervention by several electric utilities who were largely aligned with state regulators in defending a major state reform plan that restructured retail power regulation in the state. *Patch*, 173 F.R.D. at 27–28. From these decisions, MPSA infers a general rule that the state defendant's representation is inadequate as a matter of course whenever it is also the *regulator* of the entity that seeks to intervene.

The cases do not support such a *per se* rule. We certainly did not adopt such a rule in *Mosbacher*, where the intervenors overcame the presumption of adequate representation by the government defendant because, *inter alia*, the agency had not filed an answer to the complaint but had instead accepted a consent decree providing for virtually all the relief sought and subjecting the fishing groups to more stringent rules than had previously been in effect. *Id.* at 44. It is not clear whether the district court was applying a *per se* rule in *Patch*; but in any event that part of its decision was not appealed to us.

Here, there is no doubt that the Commonwealth was zealously interested in upholding the validity of the statute. The only difference between it and the would-be intervenors was their interest in offering *other* legal arguments (for example, based on the Twenty–First Amendment) to sustain the statute. But these arguments were easily presented in amicus briefs. This is not a case where the complaint was framed so as to require an evidentiary determination and where the would-be intervenors had information that could only be presented by their participation as parties. *See generally Daggett*, 172 F.3d at 112.

The would-be intervenors point out that an amicus does not enjoy the same opportunities as a full-fledged litigant even to offer legal argument; for example, in this court, amicus briefs are shorter than regular briefs and oral argument is at the court's discretion. Fed. R.App. P. 29(d),(g). But a court is usually delighted to hear additional arguments from able amici that will help the court toward right answers, and the amici can easily seek a larger allotment of pages or time to participate in oral argument. *See id.*

---

5. In *Daggett* we were concerned that the district court might possibly have been misled by our own language in *Moosehead Sanitary Dist. v. S.G. Phillips Corp.* 610 F.2d 49, 54 (1st Cir.1979), suggesting that only a limited number of "cubbyholes" existed for claims of inadequate representation. *See Daggett*, 172

F.3d at 113. In the present case, while the district court's decision cites *Moosehead*, it also makes clear that the court did not impose any artificial limitation on the way in which parties may show inadequate representation. *Massachusetts Food Ass'n*, 184 F.R.D. at 222–23.

The more interesting claim is that the Commonwealth might refuse to appeal if it lost; or—if it won and plaintiffs sought *certiorari*—the Supreme Court might limit the questions to be considered to those set forth in the *certiorari* petition. But amici, like respondents, can advise the Supreme Court of missing arguments. *Davis v. United States,* 512 U.S. 452, 457 n. *, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (citing *Teague v. Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion)). And if the Commonwealth refused to appeal from a defeat, a would-be intervenor could then seek to intervene. 7C Wright, Miller & Kane, *Federal Practice and Procedure* § 1909, at 345 & n. 38 (1986); *see also Daggett,* 172 F.3d at 112.

As for permissive intervention, the would-be intervenors likely met the low threshold set by Rule 24(b)—that their defenses included questions of law common to the defenses offered by the state. Fed. R.Civ.P. 24(b). But even where this necessary condition is present, the rule merely permits intervention at the discretion of the district court. *Daggett,* 172 F.3d at 112–13. The district court reasonably concluded that the Commonwealth was adequately representing the interests of everyone concerned to defend the statute and that any variations of legal argument could adequately be presented in amicus briefs. We see no abuse of discretion in this ruling.

*Affirmed.*