**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COSTCO WHOLESALE CORPORATION,
a Washington corporation,
*Plaintiff-Appellee,*

v.

NORM MALENG,
*Defendant,*

WASHINGTON BEER & WINE
WHOLESALERS ASSOCIATION,
*Defendant-Intervenor,*

and

ROGER HOEN; VERA ING; MERRITT
D. LONG, in their official
capacities as members of the
Washington State Liquor Control
Board,
*Defendants-Appellants.*

No. 06-35538

D.C. No.
CV-04-00360-MJP

3291

COSTCO WHOLESALE CORPORATION,
a Washington corporation,
                    *Plaintiff-Appellee,*

              v.

NORM MALENG; ROGER HOEN; VERA
ING; MERRITT D. LONG, in their
official capacities as members of
the Washington State Liquor
Control Board,
                           *Defendants,*

              and

WASHINGTON BEER & WINE
WHOLESALERS ASSOCIATION,
                    *Defendant-Intervenor-*
                           *Appellant.*

No. 06-35542

D.C. No.
CV-04-00360-MJP

COSTCO WHOLESALE CORPORATION,
a Washington corporation,
              *Plaintiff-Appellant,*

              v.

NORM MALENG,
                        *Defendant,*

              and

ROGER HOEN; VERA ING; MERRITT
D. LONG, in their official
capacities as members of the
Washington State Liquor Control
Board,
              *Defendants-Appellees,*

WASHINGTON BEER & WINE
WHOLESALERS ASSOCIATION,
              *Defendant-Intervenor-*
                        *Appellee.*

No. 06-35543

D.C. No.
CV-04-00360-MJP

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeals from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
March 8, 2007—Seattle, Washington

Filed January 29, 2008
Amended April 1, 2008

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

David J. Burman, Perkins Coie, LLP, Seattle, Washington, argued the cause and filed briefs on behalf of Costco Wholesale Corporation. Also on the briefs were Michael Sandler, Shyla R. Alfonso, Kenneth Morissette Jr., and Jeffrey M. Hanson.

Martha P. Lantz, Assistant Attorney General, State of Washington, Tumwater, Washington, argued the cause and filed briefs on behalf of Roger Hoen, et al. and the State of Washington. Also on the briefs were Rob McKenna, Attorney General, State of Washington, and David M. Hankins, Assistant Attorney General, State of Washington.

John C. Guadnola, Malanca, Peterson & Daheim LLP, Tacoma, Washington, argued the cause and filed briefs on behalf of the defendant-intervenors, Washington Beer and Wine Wholesalers Association. Also on the briefs were J. Bradley Buckhalter, Andrea H. McNeely and Paul R. Romain.

*Amicus Curiae Briefs were filed by:*

Korean-American Grocers Ass'n (In support of Appellants):
  John D. Wilson & Alfred E. Donohue, Seattle, Washington.

Washington Food Industry & Northwest Grocery Ass'n (In support of Appellee):
  Daniel A. Malone, Tacoma, Washington.

American Beverage Licensees Ass'n (In support of Appellants):
  Anthony S. Kogut, East Lansing, Michigan,

The State of Oregon (In support of Appellants):
  Hardy Myers, Attorney General, State of Oregon, Mary H. Williams, Solicitor General, State of Oregon & Paul L. Smith, Assistant Attorney General, State of Oregon, Salem, Oregon.

The Beer Institute (In support of Appellants):
  Arthur J. Decelle, Washington, DC, Anne Kimball & Sarah Olson, Chicago, Illinois, and Christopher W. Tompkins, Seattle, Washington.

Washington Restaurant Ass'n (In support of Appellee):
  Peter Danelo & Justo Gonzales, Seattle, Washington.

National Alcohol Beverage Control Ass'n Inc. (In support of Appellants):
  James M. Goldberg, Washington, DC.

National Beer Wholesalers Ass'n & Wine and Spirits Wholesalers of America (In support of Appellants):
  Michael Madigan & Katherine Becker, Minneapolis, Minnesota.

The State of Ohio and 22 other states (In support of Appellants):
  Jim Petro, Attorney General, State of Ohio, Peter M. Thomas, Senior Deputy Attorney General, State of Ohio & Todd R. Marti, Assistant Solicitor, State of Ohio, Columbus, Ohio.

---

## ORDER

The opinion filed on January 29, 2008 is amended as follows:

At Slip Op. p. 1426, line 5-9, replace <includes a severability provision. *See* RCW 66.28.090. That section provides: "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." *Id.*> with <has explicitly allowed for severability since it was enacted. *See* RCW 66.98.020, 080, and 090.>

At Slip Op. p. 1426, line 12-13, replace <does raise a presumption that such is the State's intent> with <"may provide the assurance" of such desire. *McGowan v. State*, 60 P.3d 67, 75 (Wash. 2002).>

The panel has unanimously voted to deny the petitions for rehearing and rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing and rehearing en banc are DENIED. **No further petitions shall be entertained.**

---

## OPINION

O'SCANNLAIN, Circuit Judge:

In these consolidated appeals, we must decide whether certain restrictions imposed by the State of Washington on the sale of wine and beer are preempted by federal antitrust laws. If the challenged restraints are subject to federal preemption, we must then decide whether they might be otherwise saved by operation of the State's powers under Section 2 of the Twenty-first Amendment to the United States Constitution.

# I

## A

In early 1933, the Twenty-first Amendment to the Constitution was passed in Congress.[1] It was then ratified by convention in 36 states and went into effect in December 1933, ending this country's experiment with Prohibition. Importantly, the Twenty-first Amendment not only repealed the Eighteenth Amendment to the Constitution,[2] but it also, in Section 2, provided that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The states took up the regulation of intoxicating beverages by adopting varying regulatory schemes. In Washington, a special session of the legislature was convened to craft a system for the regulation of alcohol and, eventually, the Steele

---

[1]The Twenty-first Amendment provides in full: "Section 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed. Section 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited. Section 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress." U.S. CONST. amend. XXI.

[2]The Eighteenth Amendment provided: "Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited. Section 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation. Section 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress." U.S. CONST. amend. XVIII (repealed 1933).

Act was passed in 1934. The Steele Act created what can best be described as a "mixed" form of regulation in which the State retained exclusive control over the sale of packaged spirits through state and contract stores, but regulated the sale of beer and wine through a three-tier system that separates manufacturers from retailers.[3]

To oversee the alcoholic beverage industry, the State created the Washington State Liquor Control Board ("LCB"). The organizing statute of the LCB provides:

> There shall be a board, known as the "Washington state liquor control board," consisting of three members, to be appointed by the governor, with the consent of the senate, who shall each be paid an annual salary to be fixed by the governor in accordance with the provisions of Revised Code of Washington ("RCW") 43.03.040. The governor may, in his discretion, appoint one of the members as chairman of the board, and a majority of the members shall constitute a quorum of the board.

RCW 66.08.012. Roger Hoen, Vera Ing and Merritt Long, who are named as parties in this suit, were the members of the LCB at the time this suit was initiated.[4]

---

[3]As the district court explained, a "three-tier system consists of the following levels: manufacturer, distributor, and retailer. Under a three-tier system, manufacturers sell products to distributors, who in turn sell the products to retailers." *Costco Wholesale Corp. v. Hoen*, No. C04-360P, 2006 WL 1075218, *3 (W.D. Wash. Apr. 21, 2006). Washington's "three-tier" system is no longer a perfect system of tiers because it allows direct sales to be made to retailers by both in-state and out-of-state manufacturers of beer and wine. *See infra* n.5.

[4]Hoen remains a member of the LCB. Lorraine Lee now serves as LCB Chairman and Ruthann Kurose is the other member.

B

Costco Wholesale Corporation ("Costco") operates an international chain of membership warehouses. It began operations in 1983 in Seattle, Washington. As of its most recent annual filing with the Securities and Exchange Commission, Costco counted 50,400,000 total cardholders. Costco Wholesale Corp., Annual Report (Form 10-K), at 6 (Oct. 25, 2007).

Costco's warehouse businesses are "based on the concept that offering [its] members very low prices on a limited selection of nationally branded and selected private-label products in a wide range of merchandise categories will produce high sales volumes and rapid inventory turnover." *Id.* at 3. Costco's business model also relies upon "operating efficiencies achieved by volume purchasing, efficient distribution and reduced handling of merchandise in no-frills, self-service warehouse facilities." *Id.* These operating efficiencies enable Costco to achieve profitability despite low gross margins.

On February 20, 2004, Costco filed a complaint against the LCB; members of the LCB in their official capacity (Hoen, Ing and Long); Norm Maleng, then-King County Prosecuting Attorney; and Christine Gregoire, then-Attorney General of Washington.[5] The complaint alleged that certain laws and regulations enforced by the State on the sale of beer and wine "restrict many of [Costco's] efficient and competitive practices as to wine and beer suppliers and create or facilitate agreement among distributors and among wineries and brew-

---

[5]Costco's complaint also initially challenged Washington's policy of allowing only in-state beer and wine producers to sell their products directly to retailers. In its December 21, 2005 Order, the district court granted partial summary judgment to Costco, ruling that Washington's policy violated the Commerce Clause. Subsequent to that ruling, the Washington Legislature enacted legislation extending the direct sales privilege to out-of-state producers as well. The Commerce Clause challenge is not before us and we thus express no views on the district court's resolution of that matter.

ers ('manufacturers') in restraint of competition." The complaint also alleged that the State of Washington has no clearly articulated or affirmatively expressed policy of eliminating competition in liquor sales and that the LCB does not monitor market conditions or the competitiveness or reasonableness of prices. As such, the complaint alleged that the challenged laws and regulations were restraints of trade preempted by Section 1 of the Sherman Act, 15 U.S.C. § 1.

C

Costco's antitrust lawsuit challenged nine specific restraints on the sale and distribution of wine and beer in the State of Washington. These restraints are primarily found in RCW 66.28.180, RCW 66.28.185, RCW 66.28.070, and in several implementing regulations.

The first restraint is known as the "uniform pricing rule." Under RCW 66.28.180(3)(b), each brewery and winery must sell a particular product at the same price to every distributor. Distributors in turn must sell their beer and wine products to every retailer at the same price they have posted. RCW 66.28.180(2)(c). *See also* RCW 66.28.170 ("It is unlawful for a manufacturer of wine or malt beverages holding a certificate of approval issued under RCW 66.24.270 or 66.24.206 or the manufacturer's authorized representative, a brewery, or a domestic winery to discriminate in price in selling to any purchaser for resale in the state of Washington.").

The second restraint is known as the "price posting" requirement. According to this requirement, "[e]very beer or wine distributor shall file with the board at its office in Olympia a price posting showing the wholesale prices at which any and all brands of beer and wine sold by such beer and/or wine distributor shall be sold to retailers within the state." RCW 66.28.180(2)(a). The posted prices are publicly available after they take effect.

The third restraint is related to posting and is known as the "hold" requirement: beer and wine manufacturers and distributors must "hold" to their posted prices for at least 30 days. *See* Washington Administrative Code ("WAC") 314-20-100(2), (5); WAC 314-24-190(2), (5).

The fourth restraint is a minimum mark-up provision. With limited exceptions, under RCW 66.28.180(2)(d) and (3)(b), distributors and suppliers must price their products at no less than 10% above their acquisition costs. RCW 66.28.180(2)(d) ("No price may be posted that is below acquisition cost plus ten percent of acquisition cost. However, the board is empowered to review periodically, as it may deem appropriate, the amount of the percentage of acquisition cost as a minimum mark-up over cost and to modify such percentage by rule of the board, except such percentage shall be not less than ten percent.").

The fifth restraint is a ban on providing discounts based upon the volume of product purchased. *See* RCW 66.28.180(2)(d) ("Quantity discounts are prohibited."); RCW 66.28.180(3)(b) (same).

The sixth restraint is a ban on sales of beer and wine on credit. RCW 66.28.010(1)(a). This rule is implemented by several Washington regulations. *See* WAC 314-20-090 ("No beer distributor nor brewer or beer importer holding a beer distributor's license shall sell or deliver beer to any retailer except for cash paid at the time of the delivery thereof: Provided, That cash may be paid prior to the delivery of beer sold to any retailer."); WAC 314-13-015 (delineating the forms of payment which the LCB will accept as "cash payment").

The seventh restraint is the "delivered price" requirement. Under this provision, distributors must sell beer and wine at the same "delivered" price to all retailers, even if the retailer pays the freight and picks up the goods itself. *See* RCW 66.28.180(2)(h)(ii) ("Beer and wine sold as provided in this

section shall be delivered by the distributor or an authorized employee either to the retailer's licensed premises or directly to the retailer at the distributor's licensed premises . . . A distributor's prices to retail licensees shall be the same at both such places of delivery.").

The eighth restraint is known as the central warehousing ban. Washington prohibits retailers from storing or taking delivery of beer and wine at a central warehouse. *See* RCW 66.24.185(4) ("Warehousing of wine by any person other than (a) a licensed domestic winery or a bonded wine warehouse licensed under the provisions of this section, (b) a licensed Washington wine distributor, (c) a licensed Washington wine importer, (d) a wine certificate of approval holder (W7), or (e) the liquor control board, is prohibited.").

Finally, the ninth restraint, and the only one upheld by the district court, is Washington's prohibition on retailers selling beer and wine to other retailers. Pursuant to RCW 66.28.070(1), except in limited circumstances, it is "unlawful for any retail beer or wine licensee to purchase beer or wine, except from a duly licensed distributor, domestic winery, domestic brewer, certificate of approval holder with a direct shipment endorsement, or the [liquor control] board."

## D

On July 29, 2004, the LCB moved for judgment on the pleadings, primarily arguing that the above-mentioned restraints were not preempted by the Sherman Act because they were "unilateral" restraints of trade imposed by the State. The district court, Judge Marsha Pechman presiding, denied this motion, concluding that the defendants failed to show that there was no irreconcilable conflict between the challenged scheme in Washington and the Sherman Act. The district court further concluded that Washington's scheme constituted a hybrid system of regulation.

Thereafter, Costco and the LCB defendants and Defendant-Intervenor Washington Beer & Wine Wholesalers Association ("WBWWA") filed separate motions for summary judgment on the antitrust claims.[6] The district court concluded in its December 21, 2005 Order that Costco had demonstrated that Washington's posting, holding, minimum mark-up, delivered pricing, uniform pricing, ban on volume discounts, and ban on credit sale requirements were in irreconcilable in conflict with federal antitrust law. It also concluded that Washington did not actively supervise its regulatory scheme within the meaning of *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105-06 (1980) (*Midcal*), because it neither reviewed resulting prices for reasonableness nor monitored market conditions. As for the retailer-to-retailer sales ban and central warehousing ban, the district court concluded that additional supplemental briefing was necessary. Because of these conclusions, the district court denied the defendants' motions for summary judgment. The district court also denied Costco's motion for summary judgment, however, because it concluded that, viewing the evidence in the light most favorable to the non-moving party, material issues of fact remained regarding the State's Twenty-first Amendment defense.

On March 7, 2006, the district court issued a "Supplemental Order on Summary Judgment Motion Re: Antitrust Claims." In that Order, the district court concluded that the central warehousing ban was a hybrid restraint that was in irreconcilable conflict with federal antitrust law and not saved by state action immunity. The district court reserved for trial the question of whether the ban might be preserved as a valid exercise of the State's Twenty-first Amendment power. The

---

[6]The district court granted WBWWA's motion for leave to intervene in this litigation on May 21, 2004. The court concluded that the "Association may intervene as a matter of right under Fed. R. Civ. P. 24(a) because its members have a protectable interest in this litigation that will be impaired or impeded if not allowed to intervene, and the government Defendants may not adequately represent the Association's interests."

district court also reserved ruling on the retailer-to-retailer sales ban and directed the parties to respond further to each other's arguments in their trial briefs.

The trial on Washington's Twenty-first Amendment defense took place in March 2006. Numerous witnesses were called to testify, including members of the LCB and expert witnesses such as historian William Rorabaugh and economists Dr. Frank Chaloupka and Dr. Keith Leffler. The district court issued its "Findings of Fact and Conclusions of Law" on April 21, 2006. *Costco Wholesale Corp. v. Hoen*, No. C04-360P, 2006 WL 1075218 (W.D. Wash. Apr. 21, 2006) (hereinafter "Findings of Fact"). The district court found, "[f]or the most part," that the policies challenged by Costco were not effective in advancing the state's core interests under the Twenty-first Amendment. *Id.* at *1. The court found no "persuasive evidence that the purpose of any of the challenged restraints was to promote temperance by raising average beer and wine prices." *Id.* at *5, ¶ 16. In addition, the court was not persuaded "that the challenged restraints are effective in promoting temperance, whether viewed individually or as a whole." *Id.* at *6, ¶ 18. Although acknowledging that the evidence at trial indicated that Washington has one of the lowest rates in the country for per capita ethanol consumption, it did not see any "persuasive evidence that the [sic] Washington's relatively low rates of ethanol consumption per drinker are due to any of the challenged restraints, either viewed individually or as a whole." *Id.*[7] Finally, the district court determined that, even if the restraints were effective in raising prices and promoting temperance in this manner, the State "could readily achieve that goal in a manner that does not run afoul of the Sherman Act. Most obviously, the State could adopt higher excise taxes." *Id.* at *7, ¶ 22. Thus, the district court concluded that the State's interests could not prevail over the federal interest in promoting competition.

---

[7]In common usage, ethanol is referred to simply as alcohol.

The district court's determinations that the "hybrid" Washington restraints were ineffective or only of minimal effectiveness in promoting the State's interests led to the conclusion that the restraints were not saved from preemption by Section 2 of the Twenty-first Amendment and the district court therefore enjoined the LCB from enforcing the restraints. *Id.* at \*10.

The LCB defendants and WBWWA filed timely notices of appeal of the district court's judgment. In addition, Costco filed a timely notice of cross-appeal of the district court's ruling upholding the retailer-to-retailer sales ban.[8]

## II

### A

The "threshold question" in this appeal is whether Washington State's plan for pricing wine and beer is preempted by the Sherman Act. *Midcal*, 445 U.S. at 102. A party may successfully enjoin the enforcement of a state statute only if the statute on its face irreconcilably conflicts with federal antitrust policy. *See Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). In other words, to be struck down, the regulation or restraint must effect a per se violation of the Sherman Act. Per se rules of illegality can be invoked only when they apply to practices "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Continental T.V., Inc. v.*

---

[8]The district court subsequently agreed to stay its judgment until May 1, 2007 in order to give the State Legislature "an opportunity to take action in response to the Court's ruling." *Costco v. Hoen*, No. C04-360P, 2006 WL 2645183 (W.D. Wash. Sept. 14, 2006). After we heard oral argument, we ordered that the district court's stay remain in effect "until further order of this court or until issuance of the mandate."

*GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977) (internal citations omitted).

In answering this "threshold" question, we are confronted immediately with two distinct methodological problems. The first is whether the challenged restraints are to be analyzed individually or as a bundle, in other words, as an entire "conspiracy"? In addressing this question, we must reconcile two sometimes competing, but well-settled, legal propositions. First, when the constitutionality of a state statute is challenged, principles of state law guide the severability analysis and we should strike down only those provisions which are inseparable from the invalid provisions. *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 556-57 (9th Cir. 2004) (citing *Dep't of Treas. v. Fabe*, 508 U.S. 491, 509 n.8 (1993)). Second, in the antitrust context, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)).

We think that, for reasons to be explained, the issue of severability in this case is intimately tied to the question of whether the restraints herein challenged are "hybrid" or "unilateral" restraints. We therefore deal with the procedural issue of severability in resolving the merits of the appeal.

B

The second methodological problem arises because of the uncertain relationship between the "active supervision" inquiry under *Midcal*, 445 U.S. at 105, and the "hybrid/unilateral" inquiry under *Fisher v. City of Berkeley*, 475 U.S. 260 (1986). As "state regulatory programs [can] not violate [the Sherman Act]," we generally must determine whether a "state's involvement in [a] price-setting program is sufficient to establish antitrust immunity." *Midcal*, 445 U.S. at 103-04

(citing *Parker v. Brown*, 317 U.S. 341 (1943)). *Midcal*, which provides the framework for evaluating claims of state action immunity under *Parker*, articulates a two-part test for immunity to apply. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105 (citing *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978) (opinion of Brennan, J.)).

In *Fisher*, the Supreme Court introduced a wrinkle to the *Midcal* inquiry when it articulated that "[a] restraint imposed unilaterally by government does not become concerted-action within the meaning of [§ 1 of the Sherman Act] simply because it has a coercive effect upon parties who must obey the law." 475 U.S. at 267. Thus, *Fisher* appeared to preempt application of the preemption inquiry by holding that some *types* of regulations are entirely immune from the *Midcal* analysis, depending upon whether the restraint can be characterized as a "unilateral" restraint or as a "hybrid" restraint. *See Fisher*, 475 U.S. at 267-68 ("Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions."). In *Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007), we confirmed that "where the state, acting as a sovereign, imposes restraints on competition," the state "is immune from antitrust liability, regardless of whether the restraint in question would satisfy the *Midcal* test." *Id.* at 918. Hence, once we determine that a restraint is unilaterally imposed by the state as sovereign, *Parker* immunity applies without further inquiry. If the restraint is not unilaterally imposed, but rather involves "a state's decision to let producers dictate market conditions to others," it is a hybrid restraint that is "illegal per se under the Sherman Act." *Id.* *Parker* immunity applies to the hybrid restraint only if it satisfies the two-part *Midcal* inquiry.

We have previously recognized that the Supreme Court has not provided clear guidance in defining the relationship

between the "hybrid" restraint inquiry and the *Midcal* "active supervision" inquiry. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189, 1192 n.8 (9th Cir. 2001) ("The Court has not clearly defined the relationship between federal antitrust preemption of state laws restricting competition and the state action immunity doctrine.") (internal citations omitted). In *Midcal*, the court treated the issues of preemption and immunity as essentially the same inquiry, whereas in *Rice* and *Fisher*, the court drew a fine line between the inquiries. *See Rice*, 458 U.S. at 662 n.9 ("Because of our resolution of the pre-emption issue, it is not necessary for us to consider whether the statute may be saved from invalidation under the doctrine of *Parker* . . . ."); *Fisher*, 475 U.S. at 270 (holding that because the rent controls were not "a per se violation of § 1 of the Sherman Act," the court "need not address whether . . . they would be exempt under the state-action doctrine from antitrust scrutiny"); *see also* PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, ¶ 217d (3d ed.) ("Our most essential point here is that the state action exemption from the antitrust laws simply expresses the conclusion that certain state laws are not preempted. The *Midcal-Rice-Fisher* inquiry and the *Parker* inquiry are fundamentally consistent but sequential.").

We believe that in this case—and many others—there is such substantial overlap between the active supervision and hybrid inquiries that they effectively merge. We are not alone in drawing this conclusion. *See* Merrick Garland, *Antitrust and State Action: Economic Efficiency and the Political Process*, 96 YALE L.J. 486, 507 (1986) ("There are signs that the *Fisher* court understood the way in which its preemption analysis collapses into the *Midcal* test."); *id.* at 489 (concluding that *Fisher* merely "restat[ed]" *Midcal*'s basic tenets); Daniel J. Gifford, *The Antitrust State-Action Doctrine After* Fisher v. City of Berkeley, 39 VAND. L. REV. 1257, 1283-84 (1986) ("The class of restraints deemed hybrid under *Fisher* ought to be coextensive with the restraints that cannot pass the *Midcal* supervision requirement. No reason exists for construing

*Fisher*'s hybrid category broadly in order to subject restraints to evaluation under the *Midcal* supervision test if those restraints by nature will pass that test . . . Occam's razor ought to dispense with the evaluation of hybrid restraints under *Midcal*'s supervision requirement.").

In the case of a facial challenge to a state regulation, we believe that a determination of whether a restraint is hybrid will largely answer the question of whether the state actively supervises the restraint. Until the Supreme Court further clarifies this doctrinally confusing area, however, we will follow the lead of other courts and begin by determining whether the restraint is hybrid or unilateral. *See Freedom Holdings v. Spitzer*, 357 F.3d 205, 223-24 (2d Cir. 2004)*; TWFS, Inc. v. Schaefer*, 242 F.3d 198, 208-09 (4th Cir. 2001). We will then consider, out of an abundance of caution, whether there exists any reason to apply further the state action immunity analysis of *Parker* to any restraints deemed to be hybrid in nature.

## C

Which leads us to the *Fisher* inquiry. What precisely does it mean for a restraint to be hybrid? It has been noted that the line between a hybrid and unilateral restraint "is extraordinarily elusive." John E. Lopatka & William H. Page, *State Action and the Meaning of Agreement Under the Sherman Act: An Approach to Hybrid Restraints*, 20 YALE J. ON REG. 269, 272 (2003). Although undoubtedly elusive, the line becomes less hazy by reference to the Supreme Court's decisions in this area.

In *Fisher*, the Court was faced with a city's rent control regulations setting maximum rental prices. It found that the rent control regulation was a classic "unilateral restraint," because "[t]he ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy." 475 U.S. at 267. It continued:

> While the Ordinance does give tenants—certainly a group of interested private parties—some power to trigger the enforcement of its provisions, it places *complete control* over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate have been unilaterally imposed on the landlords by the city.

*Id.* at 269 (emphasis added). Thus, because the restraints were unilaterally imposed, the Court held that the rent control statute was not in irreconcilable conflict with the Sherman Act, even though such a maximum pricing scheme might otherwise be a per se violation.

In reaching this conclusion, the *Fisher* court distinguished two prior cases as involving "hybrid restraints." In *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 385-87 (1951), a Louisiana statute authorized a distributor to enforce agreements fixing minimum retail prices not only against parties to such contracts, but also against retailers who sold the distributor's products without having agreed to the price restrictions. The *Fisher* court noted that,

> [U]nder the Louisiana statute, both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of distributors. While the petitioner-retailer in that case may have been legally required to adhere to the levels so selected, the involvement of his suppliers in setting those prices made it impossible to characterize the regulation as unilateral action by the State of Louisiana.

475 U.S. at 268.

The *Fisher* court also recognized that the scheme in *Midcal* represented a hybrid restraint. *Id.* at 268-69. California

required that all wine producers and wholesalers file fair trade contracts or price schedules with the State. If a wine producer did not set prices, wholesalers had to post a resale price schedule for that producer's brands. No State-licensed wine merchant could sell wine to a retailer at other than those prices. *Midcal*, 445 U.S. at 99. The *Midcal* court concluded that the statute was preempted and *Parker* immunity was not available, because "[t]he State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.* at 105-06. In other words, the lack of active supervision over private pricing decisions rendered the regulations hybrid restraints.

Finally, in a post-*Fisher* case, *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987), the Court dealt with a New York statute that permitted wholesalers to control the minimum resale price of liquor charged by retailers. As in *Midcal*, the court found the statute preempted even though there were no private agreements involved; the court again focused on the fact that the State authorized vertical price fixing without supervising in any meaningful way the amount of those prices. *Id.* at 344-45. The scheme in effect delegated a "degree of private regulatory power" to the private actors. *Id.* at 345 n.8.

**[1]** The rule to be taken from these cases is that state statutes or local ordinances creating unsupervised private power in derogation of competition are subject to preemption. *See Freedom Holdings*, 357 F.3d at 223 ("Where the anticompetitive effects of a state statute obviate the need for private parties to act on their own to create an anticompetitive scheme, the statute may be attacked as a 'hybrid' restraint on trade."). But courts must be careful not to rely upon the presence of anti-competitive effect alone; a state regulation is not rendered hybrid solely because it produces an effect that could not be produced by agreement of private parties without violating the antitrust laws. *Mass. Food Ass'n v. Mass. Alcoholic*

*Beverages Control Comm'n*, 197 F.3d 560, 564 (1st Cir. 1999); *Fisher*, 475 U.S. at 266 ("What distinguishes the operation of Berkeley's Ordinance from the activities of a benevolent landlords' cartel is not that the Ordinance will necessarily have a *different economic effect*, but that the rent ceilings have been unilaterally imposed by government upon landlords to the exclusion of private control.") (emphasis added).[9] As Judge Boudin of the First Circuit has artfully noted, "[w]hat is centrally forbidden is state licensing of arrangements between private parties that suppress competition—not state directives that by themselves limit or reduce competition." *Mass. Food Ass'n*, 197 F.3d at 566.

## III

### A

We first apply these principles to Costco's cross-appeal of the district court's conclusion that the retailer-to-retailer sales ban constituted a "unilateral" restraint of trade. With little analysis, the district court concluded in its April 21, 2006 "Findings of Fact and Conclusion of Law" that this policy "does not grant a degree of private regulatory power to private actors," and thus was a unilateral restraint imposed "purely by the State."

[2] We agree with the district court that the ban on sales by retailers to other retailers is a unilateral restraint of trade that is not subject to preemption by the Sherman Act. The ban on sales by retailers to other retail institutions is akin to the rent control ordinance in *Fisher*. In *Fisher*, the city imposed a

---

[9]Prior to his entering active judicial service, our colleague on the D.C. Circuit, Judge Merrick Garland, expressed the same idea in an article discussing the Supreme Court's state-action antitrust jurisprudence. He wrote: "The post-*Parker* cases constitute the Court's efforts to thread this needle — an effort to protect true state regulation, even if anticompetitive, but to bar mere state 'authorization' of private anticompetitive conduct." Garland, 96 YALE L.J. at 500-01.

restraint on the pricing decisions of landlords by establishing a maximum rent control ceiling; but the court found the concerted action requirement missing because whatever anti-competitive effect of the Ordinance (and the Court assuredly recognized there would be one) was the result of the city's command, not of private action. In other words, public officials determined the nature and extent of the resulting consumer injury, with no degree of discretion delegated to private actors. *See* Page & Lopatka, 20 YALE J. ON REG. at 272. Similarly here, an anti-competitive effect can surely be hypothesized from the State's ban on sales of beer and wine to retailers by other retailers. The ban removes from the market certain firms or persons who might otherwise compete; with fewer, and likely larger, horizontal competitors, prices for the consumer may be higher than they would otherwise be in the absence of the ban. But the potential anti-competitive effect is not the result of private pricing or marketing decisions, but the logical and intended result of the statute itself. *See* AREEDA & HOVENKAMP, ¶ 221e4 ("On occasion, the initial legislative decision may leave nothing further to be decided by the relevant private parties, as well as nothing for the state to supervise. In that event, the initial enactment would be a legislative decision that would itself satisfy the supervision requirement."). No further action is necessary by the private parties because the anti-competitive nature of this restraint is complete upon enactment; the conclusion must follow, therefore, that the restraint is unilateral.

The First Circuit's decision in *Massachusetts Food Association*, 197 F.3d at 560, supports this conclusion. In that case, Massachusetts required retail outlets to be licensed, with each license embracing only a single location. Massachusetts law further provided that no firm or person could own more than three licenses; thus, no firm or person can own more than three retail liquor stores in the Commonwealth. *Id.* at 562. Judge Boudin, writing for the court and rejecting an antitrust challenge to the statute, noted that "the state has not ordered or authorized private parties to engage in conduct that, absent

immunity, would even arguably violate the antitrust laws; there is no private agreement or arrangement between retailers as to the number of retail outlets and therefore no violation to be shielded. The state simply insists upon licensing retail liquor stores—as it does for many businesses or professions—and limits the number of licenses to three per owner." *Id.* at 564.

**[2]** As with Massachusetts' limitation on the number of licenses any one firm can own, Washington's requirement that a retailer not sell to other retailers (in other words, that it choose between being a retailer and a wholesaler) may yield anti-competitive effects.[10] But whatever anti-competitive effect there is, it is not contingent upon private action, but is simply part-and-parcel of the state-imposed licensing scheme. The retailer-to-retailer sales restraint, like the rent control ordinance in *Fisher*, is complete upon enactment and does not delegate any authority to private parties. It therefore lacks the "concerted action" requirement of *Fisher*. We agree with the First Circuit that "unless such a statute licenses or commands a private restraint, this is a matter for the voters and not for the federal courts—at least so far as the Sherman Act is concerned." *Id.* at 565. Because this ban on retailer-to-retailer sales neither licenses nor commands a private restraint but is instead a unilaterally imposed restraint of the sovereign, we agree with the district court's determination that it is not subject to preemption.

B

We next consider the district court's conclusions that the central warehousing ban (a) should be considered as a component of the State's entire regulatory scheme and (b) is a hybrid

---

[10]We view the ban on retailer sales to other retailers as a fundamental component of the State's "unquestionably legitimate" three-tier distribution system. *Granholm v. Heald*, 544 U.S. 460, 489 (2005) (internal citations omitted).

restraint. We disagree with the district court's conclusions on both counts.

In a central warehousing system, a grocery chain or large retailer like Costco buys goods in large lots from manufacturers and suppliers. The goods are delivered to a central warehouse by the manufacturer or supplier. From there, trucks belonging to the chain or cooperative haul the goods to individual retail stores. Under Washington's regulations, such a system is disallowed for alcohol, as beverages may only be delivered to the retail store where the product will be sold to the consumer or directly to the retailer at the distributor's licensed premises. *See* RCW 66.28.180(2)(h)(ii).

The district court concluded in its March 7, 2006 supplemental order that this restraint was hybrid in nature only because it refused to consider it apart from the regulatory scheme as a whole. However, we conclude that the ban on central warehousing is fundamentally different from the other challenged restraints. For one thing, the central warehousing ban does not constitute an "element" of price at the distributor level and is therefore not subject to the distributor's discretion. And the restriction does not encourage cartel-like behavior through eliminating pricing uncertainties. As with the rent control ordinance in *Fisher*, there is no degree of discretion delegated to private parties by the ban; any anticompetitive effect is complete once the ban is imposed by the State.[11]

---

[11]We also believe that the central warehousing ban is akin to a non-price vertical restraint that would be evaluated under the Rule of Reason. A central warehousing system can provide numerous efficiencies for a large chain: "They pay less for the products than they would if the supplier made delivery to individual stores. Also, they can consolidate deliveries from the warehouse to individual stores. Thus, their savings due to buying in large lots and arranging for central delivery are greater than their added delivery costs." *First Beverages, Inc. v. Royal Crown Cola Co.*, 612 F.2d 1164, 1167 (9th Cir. 1980). The central warehousing ban effectively mandates where a retailer may store its products; this restraint most resembles a vertical non-price restraint that would be examined under the Rule of Reason. *See Continental T.V.*, 433 U.S. at 51 n.8.

**[4]** The error in the district court's analysis of the central warehousing ban is that it focused solely on effect. Its reasoning was as follows:

> Here, the central warehousing ban on its face is plainly anticompetitive. It serves to increase the price of beer and wine by prohibiting beer and wine retailers from engaging in more efficient and cost-effective distribution practices and reinforces other policies that the Court has found to be per se restraints. The LCB Defendants and the WBWWA do not suggest any pro-competitive rationale for the central warehousing ban, nor is any apparent. Therefore, the Court finds that the central warehousing ban is irreconcilably in conflict with the Sherman Act.

Costco's inability "efficiently" to buy in bulk, however, is a result not of the distributor's choice or collusion, but of the sovereign's command. As with the retailer-to-retailer sales ban, the State neither commands nor licenses private arrangements; it simply displaces entirely a method of storing goods.[12] The anti-competitive effect is not brought about by collusion or private action, but by legislative choice.

Indeed, if we were to follow the reasoning of the district court and look primarily to a regulation's effect to determine whether the restraint is unilateral in nature, we would risk engaging in a kind of *Lochner*-ian analysis long since discredited. *See Mass. Food Ass'n*, 197 F.3d at 565 ("To allow federal judges to decide which of these legislative enactments should survive and which should be condemned comes close to reintroducing the kind of judgments that got the Supreme

---

[12]Further, contrary to Costco's argument, the warehousing ban is not akin to an output restraint because, although it lessens the amount a particular retailer can buy at any one time, it should not decrease total supply in the end market.

Court into so much trouble in the *Lochner* era. The result might well be more competition and greater consumer welfare. But it would come at the cost of second-guessing the democratically elected legislature's decisions about the proper balance between competition and other social policies that are commonly reflected in such legislation."); Garland, 96 YALE L.J. at 499-500 (explaining that *Parker* and its progeny grew out of the Court's post-*Lochner* hands-off approach to economic regulation). The central warehousing ban may well be inefficient and it may decrease competition, but the State of Washington, through its officials, has opted for such inefficiency. Relief from such choices is properly achieved not through Sherman Act preemption, but through political will.

**[5]** In sum, the central warehousing ban is, like the ban on retailer-to-retailer sales, a unilateral restraint. The district court erred in not recognizing the nature of this restraint and, ultimately, in condemning it as a hybrid restraint. The central warehousing ban is not preempted by § 1 of the Sherman Act.

C

1

We cannot conclude, however, that the nature of the remaining restraints is equally straight-forward. We begin with the requirement that wholesalers post their prices and adhere to those prices for at least 30 days (the "post-and-hold" restraint). We addressed the validity of a nearly identical scheme in the neighboring state of Oregon in *Miller v. Hedlund*, 813 F.2d 1344 (9th Cir. 1987). In that case, a group of tavern owners and retailers sued the Oregon Liquor Control Commission ("OLCC") and several wholesalers of beer and wine, contending that certain regulations promulgated by the OLCC had the effect of stabilizing and maintaining the prices of beer and wine in Oregon. *Id.* at 1346-47. In particular, the retailers sought relief from: (1) a state regulation prohibiting quantity discounts; (2) a requirement that licensees post prices

ten days prior to their effective dates; (3) a requirement that price decreases generally remain effective after posting for a period of 180 days for malt beverages and 30 days for wine; and (4) a requirement that the posted price be the delivered price regardless of transportation costs. *Id.* at 1347. We held on appeal that Oregon's post-and-hold system and its quantity discount prohibition were hybrid restraints that violated the Sherman Act.[13]

We rejected as an "oversimplifi[cation]" the appellees' contention that "the wholesalers merely act unilaterally in response to the requirements of the regulations and that there is no agreement or concerted activity of any sort among them." *Id.* at 1349. We noted that "[w]hile it is true that there is no agreement or concerted activity among the wholesalers, it can not [sic] be ignored that the challenged regulations facilitate the exchange of price information and require adherence to the publicly posted prices." *Id.* Our holding that the post-and-hold system was a hybrid restraint of trade focused on the fact that Oregon had set up a scheme in which pricing information was shared and adhered to, but then "allow[ed] private parties to set the prices and d[id] not review the reasonableness of those prices." *Id.* at 1351. In other words, we determined that Oregon, through non-market mechanisms, had enforced or facilitated privately-made pricing decisions.[14]

The Fourth Circuit expressly agreed with our decision in *Miller* in holding that Maryland's post-and-hold system was a hybrid, per se restraint of trade. *TFWS*, 242 F.3d at 208-09. In *TFWS*, a large liquor retailer brought suit against Mary-

---

[13]The "delivered pricing" restraint was not challenged on appeal and therefore was not addressed by the *Miller* court. 813 F.2d at 1348 n.3.

[14]It is worth pointing out that our opinion in *Miller* was withdrawn after the Supreme Court granted certiorari in *324 Liquor*. After *324 Liquor* was decided, we re-filed the original opinion, noting that "*324 Liquor Corp.* confirms the reasoning and conclusions set forth in the opinion that was withdrawn." 813 F.2d at 1345.

land's comptroller and other state officials seeking a declaration that the state's regulatory scheme, which (1) required that liquor wholesalers post their prices and adhere to them, and (2) prohibited volume discounts, violated § 1 of the Sherman Act. *Id.* at 201-02. After reviewing the Supreme Court's decisions in *Midcal*, *Fisher* and *324 Liquor*, the *TFWS* court concluded that "[t]he post-and-hold system is a classic hybrid restraint: the State requires wholesalers to set prices and stick to them, but it does not review those privately set prices for reasonableness; the wholesalers are thus granted a significant degree of private regulatory power." *Id.* at 209.

The Second Circuit reached a somewhat different conclusion in *Battipaglia v. New York State Liquor Authority*, 745 F.2d 166 (2d Cir. 1984). At issue in that case was a New York statute requiring the posting of prices by liquor wholesalers and adherence to those prices. Judge Friendly, writing for the majority, concluded that the statute did not conflict with the Sherman Act and was therefore not preempted. In reaching that conclusion, he primarily relied upon an antitrust analysis, reasoning that the restraint was not a per se violation, but should instead be adjudged under the Rule of Reason. *Id.* at 174-75. In Judge Friendly's view, the exchange of pricing information would only be per se illegal where conscious parallelism was observed alongside certain "plus" factors, such as inelastic demand, high market concentration and lack of product differentiation. *Id.* at 175.[15]

---

[15]Judge Friendly's antitrust analysis strangely failed to account for the New York requirement that posted prices be adhered to by wholesalers. As Judge Winter pointedly observed in dissent, "the challenged legislation not only mandates the exchange of price information but also requires adherence to publicly announced prices until thirty days after notice is given of a new price. A requirement of adherence to announced prices has been uniformly held illegal without regard to its reasonableness." *Battipaglia*, 745 F.2d at 179 (Winter, J., dissenting) (citing and quoting *Sugar Inst. v. United States*, 297 U.S. 553, 601 (1936) ("steps . . . to secure adherence, without deviation, to prices and terms . . . announced" are illegal)).

But Judge Friendly's analysis also noted that there was a serious question as to whether there was an "agreement" within the meaning of the Sherman Act. Although not deciding the appeal on this basis, he suggested that the better position was that no amount of state compulsion should form the basis of a finding of an agreement. *Id.* at 173 (noting that "state compulsion of individual action is the very antithesis of an agreement, and the argument that an agreement could have been inferred if the wholesalers had voluntarily done what they have been compelled to do is simply too 'iffy' "). Judge Winter in dissent disagreed, noting that the statute effectively authorized private price fixing arrangements. He also concluded that the statute was not entitled to immunity because

> New York does nothing whatsoever to establish the actual prices charged, review their reasonableness, monitor market conditions, or engage in reexamination of the program. As in *Midcal*, "the national policy in favor of competition [is] thwarted by casting . . . a gauzy cloak of state involvement over what is essentially a private pricefixing arrangement."

*Id.* at 180 (Winter, J., dissenting) (quoting *Midcal*, 445 U.S. at 106)). A leading treatise on antitrust law suggests that "[g]iven the great danger that agreements to post and adhere will facilitate horizontal collusion, the dissent's position is more consistent with *Midcal*." AREEDA & HOVENKAMP, ¶ 217b.[16]

---

[16]Indeed, it appears that Judge Winter's view in *Battipaglia* has prevailed in the Second Circuit. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223-24 n.17 (2d Cir. 2004) (noting that the "agreement" question was reserved in *Battipaglia* and concluding that "since our decision in *Battipaglia*, the Supreme Court has made it clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act") (citing *324 Liquor*, 479 U.S. at 345-46 n.8).

2

**[6]** With these precedents, principles and concerns in mind, we conclude that Washington's "post-and-hold" pricing system is a hybrid restraint. In *Fisher*, the Court emphasized that the Berkeley ordinance was a unilateral restraint because "it place[d] complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate[d] [had] been unilaterally imposed on the landlords by the city." 475 U.S. at 269. In contrast here, the LCB has only part of the power of the Rent Stabilization Board; it may police the *procedures* of posting and the adherence to the posted prices, but it retains no control over the prices themselves, which are left exclusively (with the exception of the minimum mark-up) within the control of the particular wholesaler. *See Midcal*, 445 U.S. at 105 (the State "simply authorizes price setting and enforces the prices established by private parties"); *324 Liquor Corp.*, 479 U.S. at 345 ("Each wholesaler sets its own 'posted' prices; the State does not control month-to-month variations in posted prices . . . The State has displaced competition among liquor retailers without substituting an adequate system of regulation."). Although each wholesaler is only required to adhere to its own posted price and is not compelled to follow others' pricing decisions, the logical result of the restraints is a less uncertain market, a market more conducive to collusive and stabilized pricing, and hence a less competitive market.

As has been explained:

> By prohibiting certain unilateral conduct in which private parties might otherwise have engaged, post-and-hold regulations limit the domain of rivalry and thus increase the likelihood of an anticompetitive outcome that private parties could not legally achieve by actual agreement. They may facilitate

> tacit collusion, even though they do not explicitly authorize any kind of collusion.

Lopatka & Page, 20 YALE J. ON REG. at 312; *see also FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 634-35 (1992) ("Our decisions make clear that the purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties.").

The State contends that its post-and-hold differs from that which we struck down in *Miller* because the Oregon plan in that case allowed wholesalers a "sneak peek" at their competitors' pricing. In our view, very little turns on the presence of the "sneak peek." Our decision in *Miller* rested upon our refusal to ignore the fact "that the challenged regulations facilitate the exchange of price information and require adherence to the publicly posted prices." 813 F.2d at 1349. We noted further that because "Oregon allows private parties to set the prices and does not review the reasonableness of those prices . . . this case is unlike the purely public restraint of Berkeley's regulatory scheme which removed the power to set rents from the landlords." *Id.* at 1351. At no point in the decision did we emphasize the centrality to our inquiry of the advanced look at competitors' prices.

[7] We are thus unable to limit the language and reasoning of *Miller* to reach only schemes where a "sneak peek" at competitors' pricing is allowed. Although the allowance of immediate adjustments to prices within 5 days may facilitate collusion and discourage price cuts, it does not fundamentally alter the conclusion that the current post-and-hold scheme, like the one in *Miller*, facilitates and encourages interdependent prices, which prices are set solely according to private marketing decisions of non-state actors. Accordingly, we conclude, consistent with *Miller* and with the Supreme Court's

teachings, that Washington's scheme of requiring the posting of wholesale prices and adherence to those prices for at least 30 days is a hybrid restraint of trade, subject to preemption by the Sherman Act.[17]

3

We also conclude that the "post-and-hold" restraint is a per se violation of the Sherman Act. The Supreme Court has held that an agreement to adhere to posted prices is a per se violation without regard to its reasonableness. *See Catalano*, 446 U.S. at 649-50 ("[T]here is a plain distinction between the lawful right to publish prices and terms of sale, on the one hand, and an agreement among competitors limiting action with respect to the published prices, on the other."); *see also Miller*, 813 F.2d at 1349 ("If the wholesale beer and wine distributors had entered into a private agreement to accomplish what is otherwise required by the Oregon regulations, there is no question that a per se violation of Section 1 of the Sherman Act would be found."); *Sugar Inst. v. United States*, 297 U.S. 553, 601 (1936); *Sanders*, 504 F.3d at 918 (noting that a price-posting scheme "necessarily involves a delegation of market power to private parties that is per se illegal under the Sherman Act").

---

[17]We do not reach this conclusion lightly, for we share to some degree the concerns expressed in *TFWS* by our former colleague on the Fourth Circuit, Judge Michael Luttig. *See* 242 F.3d at 213-15. In a concurring opinion, Judge Luttig agreed that Maryland's post-and-hold system and volume discount ban were hybrid restraints of trade under relevant Supreme Court precedent, in particular *324 Liquor*. He worried, however, that the logic of *324 Liquor* "could result in significant areas of unilateral state action being regarded as hybrid state/private action, and therefore potentially in violation of the Sherman Act when it is not, and in derogation of what should be obvious state plenary authority." 242 F.3d at 215 (Luttig, J., concurring). Although we share this concern about broadening the reach of the antitrust laws to preempt state law, we also recognize that the Supreme Court has expressed strong disdain for state laws which leave unsupervised regulatory power in the hands of non-political, non-responsive private actors.

Such agreements to adhere to posted prices are anti-competitive because they are highly likely to facilitate horizontal collusion among market participants. When firms in a market are able to coordinate their pricing and production activities, they can increase their collective profits and reduce consumer welfare by raising price and reducing output. Lopatka & Page, 20 YALE J. ON REG. at 311 ("Under conventional models of oligopoly behavior, the dissemination of information about prices and a credible commitment to maintain those prices reduce a firm's uncertainty about its rivals pricing behavior and thereby predictably foster a non-competitive outcome."); *see also* George Stigler, *A Theory of Oligopoly*, 72 J. POL. ECON. 44 (1964) (arguing that successful collusion requires firms to overcome particular market uncertainties; one of the key uncertainties is whether another firm will "cheat" its rivals by offering a lower price). An adherence requirement effectively removes a market uncertainty by making pricing behavior transparent and discouraging variance.[18]

[8] In addition, a requirement that a firm adhere to its price for 30 days makes a price cut temporarily irreversible, and hence more expensive and much less likely. *See* AREEDA & HOVENKAMP, ¶ 217b2 n.48. Finally, "cheating" in this scenario is not monitored by means of an inherently unstable cartel; instead, enforcement of the adherence requirement is carried out by the State, with serious legal, practical and economic penalties imposed on firms who vary from posted prices. State enforcement of adherence to privately set, supra-competitive prices is precisely the danger which the Supreme Court envisioned in crafting the hybrid and active supervision tests. In

---

[18]Although LCB places much emphasis on the fact that the prices are effective once announced, as opposed to the scheme in *Miller* which gave a "sneak peek" of prices, such a distinction will not save the scheme from per se condemnation. That firms are not empowered immediately to alter their prices to meet a lower price or to adjust to a higher price does not alter the conclusion that in the long run, prices for beer and wine are more likely to be uniform and stable because of tacit collusion.

short, we have little trouble concluding that the post-and-hold scheme would constitute a per se violation of the Sherman Act. Thus, unless it is otherwise saved by the doctrine of state immunity or by the Twenty-first Amendment, Washington's post-and-hold scheme is preempted.

D

In examining the other challenged restraints—the minimum mark-up, volume discount ban, credit ban, uniform pricing requirement, and delivered pricing requirement—we must return to the preliminary problem of whether these provisions should be examined separately or as part of a single antitrust conspiracy whose goal is to stabilize prices at supra-competitive levels.

In *Miller*, without significant analysis, we appeared to lump the challenged volume discount ban in with Oregon's post-and-hold provision. In effect, we presumed an inter-connectedness to the regulations. The Fourth Circuit's deci-sion in *TFWS* provides little guidance on this issue but also considered the restraints in tandem. Its analysis on the chal-lenged volume discount ban amounted to this: "The volume discount ban is a part of the hybrid restraint because it rein-forces the post-and-hold system by making it even more inflexible. Wholesalers post their prices as required, and dis-counts of any nature are prohibited by regulation." *TFWS*, 242 F.3d at 209.

If one were to view all of these restraints as a package, with the post-and-hold requirement as the center around which all the other restraints revolve—as the district court did—it might appear that they create a market structure inviting of collu-sive, interdependent pricing, which would increase, or at the least stabilize, prices for beer and wine for retailers at supra-competitive levels. As Areeda and Hovenkamp explain:

> [T]he principal use of competitor agreements on nonprice terms is to eliminate or reduce the various

avenues down which competition can occur, thus making a secret price agreement or an oligopoly easier to maintain. For example, a price-fixing agreement or oligopoly may be frustrated by the fact that although nominal prices are readily observable from seller price lists, various firms continue to compete by negotiating rebates, discounts, or unusually favorable credit terms on an individual basis. Further, the latter are not readily observable. By agreeing with each other to eliminate discounting or rebates, the firms can shift the focus of competition to price and thus ensure that the cartel or oligopoly will function more effectively.

AREEDA & HOVENKAMP, ¶ 2022a; *see also A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 258 (3d Cir. 2001) ("[T]he injury in *Midcal* was caused by private parties taking advantage of the state imposed market structure . . . Even though, as defendants argue, the Multistate Settlement Agreement created the cartel, this fact makes the case analogous to *Midcal*, not different.").[19] In other words, taken as a

---

[19]We agree with the district court that these restraints should be considered to be of the per se variety. An agreement "to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act." *Socony-Vacuum Oil Co.*, 310 U.S. at 222; *see also Catalano*, 446 U.S. at 647-48 (a restraint "pegging, or stabilizing the price is illegal per se"). A delivered pricing arrangement that removes transportation costs from competitive bidding is also per se unlawful. *See, e.g.*, *Boise Cascade Corp. v. FTC*, 637 F.2d 573, 575 (9th Cir. 1980) (delivered pricing agreements are per se violations because "[w]hen combined with the standardization of delivery methods, service extras, and discounts, any delivered pricing system can become a potent tool for assuring that competitors are able to match prices and avoid the rigors of price competition"). The bans on credit sales and bans on discounts are also per se violations. *Catalano*, 446 U.S. at 648 ("An agreement to terminate the practice of giving credit is . . . tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing."); *see also* AREEDA & HOVENKAMP, ¶ 2022a (explaining that credit terms are an integral element of overall price). Finally, the minimum mark-up provision is a per

whole, Washington's system of regulation focuses competitive pressures entirely away from discounts and rebates and towards explicit price. And when the explicit price must be posted and adhered to for thirty days, there is a very serious risk of interdependent, non-competitive pricing. Thus, we agree with the district court that if these "pricing element" restrictions must be considered part-and-parcel of the posting scheme, then they would likely be preempted under the reasoning of *324 Liquor*.

1

**[9]** We think it would be a mistake, however, to truncate the analysis by only looking at how these provisions interact with the post-and-hold requirement. Here, we confront principles of severability to consider whether, in the absence of the publication of prices and the State's enforcement of adherence to those published prices, any of the pricing restraints might otherwise be considered legitimate, unilateral acts of the sovereign state. In applying this severability analysis, we recognize that such an inquiry is fraught with uncertainty and hypotheticals: What would a scheme without a post-and-hold requirement look like? What would be its economic effect? Would the State want such a scheme? Nonetheless, despite the uncertainty inherent in this type of analysis, we think it absolutely necessary, out of respect for the functions of the states in our federal system, to consider whether, with the post-and-hold aspects of the regulations excised, other portions of the State regulatory system may be saved from invalidation.

---

se violation because if horizontal competitors were to agree amongst themselves to mark up their products at least at a level above acquisition price, it would constitute classic price fixing. Horizontal price maintenance, as opposed to vertical price maintenance, is subject to per se condemnation. *See Socony-Vacuum Oil Co.*, 310 U.S. at 218.

The Washington Supreme Court has set forth its severability doctrine as follows:

> [A]n act or statute is not unconstitutional in its entirety unless invalid provisions are unseverable and it cannot reasonably be believed that the legislative body would have passed one without the other, or unless elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes. A severability clause may provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid. It is not necessarily dispositive on that question, though . . . . The independence of the valid from the invalid parts of an act does not depend on their being located in separate sections. The invalid provision must be grammatically, functionally, and volitionally severable.

*McGowan v. State*, 148 Wn.2d 278, 60 P.3d 67, 75 (Wash. 2002) (internal punctuation marks, footnote and citations omitted).

**[10]** In the absence of a requirement that a firm adhere to its published price, we think the volume discount ban, the delivered pricing ban, and the ban on credit sales would all be considered unilateral restraints imposed by the State, with no degree of discretion delegated to private individuals. Just as with the central warehousing ban, any anticompetitive effect arising out of these restraints is the result not of private discretion, but of the sovereign's command. There is no "meeting of the minds" to determine how much discounts will be, whether territorial variations in price will be allowed, or whether credit may be extended over a certain period of time. The State of Washington commands that *no* discounts be given, *no* credit be extended, and *no* transportation allowances be factored in;[20] that the wholesalers comply with these com-

---

[20]It is true that the ban on providing volume discounts or transportation allowances will make a firm's prices more transparent to its competitors;

mands is not enough to deem the restraints hybrid. *See Fisher*, 475 U.S. at 266 ("A restraint imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy.").

**[11]** Thus, considering these restraints in the absence of a linkage to the requirement that wholesalers publish *and adhere* to their announced prices, any semblance of an "agreement" falls away. The State does not enforce private marketing or price setting decisions, but instead enforces its own mandates. Thus, if the post-and-hold provision can be severed, we can uphold these restraints as unilateral within the meaning of *Fisher*.

**[12]** And, although we find it a slightly more difficult question, we also conclude that the minimum mark-up of 10% and the uniform price requirement, in the absence of the post-and-hold requirement, survive Sherman Act preemption because they are unilateral restraints. Costco contends that the mark-up provision is not actively supervised by the State because "[p]roducers and wholesalers can push their prices without limit above the notional 10% minimum markup, and there is no attempt to control or monitor such levels." Indeed, the district court concluded that "[t]he minimum markup requirements have virtually no impact because suppliers and distributors routinely markup their products by far more than 10%." *Findings of Fact* at *8, ¶ 28.

---

but the *delegation* of discretion to private actors, the hallmark of a hybrid restraint, is simply missing from these restraints. The nature and extent of the competitive injury to retailers is largely complete upon enactment of the bans.

Costco contends that discretion on the part of wholesalers to price above the notional 10% mark-up makes the mark-up provision impermissible. But such discretion is not a *creation* of the minimum mark-up provision. Instead, the discretion is a right of the market participant independent of the statute. The State, by imposing the 10% floor, *withdraws* a very small degree of that discretion from wholesalers, but it in no way *grants*—the Supreme Court's term in *Fisher*, 475 U.S. at 268 —the discretion in the first place. Indeed, in *324 Liquor*, the Court went out of its way to acknowledge that "[a] simple 'minimum markup' statute requiring retailers to charge 112 percent of their actual wholesale cost may satisfy the 'active supervision' requirement, and so be exempt from the antitrust laws . . . ." 479 U.S. at 345 n.6; *see Morgan v. Div. of Liquor Control, Conn. Dep't of Bus. Regulation*, 664 F.2d 353 (2d Cir. 1981) (upholding a similar markup statute in the State of Connecticut); *see also 324 Liquor*, 479 U.S. at 346 n.6 (describing the statute at issue in *Morgan* as a "simple" markup statute). Washington's 10% mark-up is the kind of requirement that the Court would uphold because it does not grant to private parties a means to manipulate, and therefore control, the pricing decisions of other firms. Instead, the Washington statute merely requires a mechanical calculation requiring that a wholesaler mark its prices at least 10% higher than its costs for the product. *See Snake River Valley Elec. Ass'n*, 238 F.3d at 1194 ("There is no reason, for example, to require state supervision of law that prescribes the percentage over wholesale that an alcohol retailer can charge. The amount is a simple calculation that the retailer has no discretion to alter."). Thus, we conclude that the discretion to price above the State-established floor is discretion to be sure, but it is not the *type* of "hybrid" discretion with which the Supreme Court was concerned in *Fisher* and *324 Liquor*.

[13] Similarly, that the uniform price requirement allows manufacturers and distributors the discretion to set their own price, which they must then apply uniformly, does not render the uniform price rule a hybrid restraint in the absence of the

post-and-hold requirement. The discretion to set a price, in the absence of any obligation to post it or maintain it for any period of time, is not a grant of discretion that facilitates horizontal price collusion. Indeed, the ability of manufacturers and distributors to set their own prices is a basis for price competition rather than a limitation on such competition. Thus, the uniform price requirement is not, in and of itself, a "hybrid" restraint.

2

**[14]** The remaining question in the severability analysis is whether the Washington legislature would have enacted these sections independently even if it knew that the post-and-hold requirement was invalid. In general, "[t]he lodestar of severability is legislative intent." *Gubiensio-Ortiz v. Kanahele*, 857 F.2d 1245, 1267 (9th Cir. 1988), *vacated*, 488 U.S. 1036 (1989), *aff'd in part and rev'd in part, on other grounds*, 871 F.2d 104 (9th Cir. 1989) (per curiam). As previously noted, the standard under Washington law requires us to sever the valid provisions from the invalid provision, unless "it cannot reasonably be believed that the legislative body would have passed one without the other, or unless elimination of the invalid part would render the remaining part useless to accomplish the legislative purposes." *McGowan*, 60 P.3d at 75.[21]

One factor that we find indicative, though not dispositive by itself, of the legislature's intent is that its alcohol regulatory scheme has explicitly allowed for severability since it was enacted. *See* RCW 66.98.020, 080, and 090. Although existence of a severability provision is not necessary to reveal

---

[21]Washington's severability analysis is thus very similar to that which has been applied to acts of Congress. *See Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (per curiam) ("Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.") (internal quotations and citations omitted).

a legislative desire to sever invalid provisions from valid ones, its presence "may provide the assurance" of such desire. *McGowan v. State*, 60 P.3d 67, 75 (Wash. 2002).

**[15]** Further, we believe that the district court's treatment of the regulatory scheme, in which it viewed everything through the prism of the post-and-hold requirement, actually turns Washington's regulatory system on its head. When viewed correctly, we think it clear that the post-and-hold provision can be excised from the remaining restraints in a way that the legislature would have intended. The district court's tacit assumption in its analysis was that the post-and-hold requirement was the center of Washington's solar system of alcohol regulation; instead, we think it clear that the uniform pricing requirement is the relevant center. All of the other restraints revolve around the uniform pricing rule because their only purpose is to enforce rigidly RCW 66.28.180(2)(c)'s requirement that each distributor sell its beer and wine products to every retailer at the same price it has posted. *See also* RCW 66.28.170 ("It is unlawful for a manufacturer of wine or malt beverages holding a certificate of approval issued under RCW 66.24.270 or 66.24.206 or the manufacturer's authorized representative, a brewery, or a domestic winery to discriminate in price in selling to any purchaser for resale in the State of Washington."). Because the other restraints are a *mechanism* for enforcing the uniform price requirement, we believe that the legislature would have enacted them even had it been aware of the invalidity of its post-and-hold system.

E

To summarize our *Fisher* analysis, we agree with the district court's conclusion that the retailer-to-retailer sales ban is a unilateral restraint not subject to Sherman Act preemption. We disagree with the district court's conclusions that the central warehousing ban, the volume discount ban, the delivered pricing requirement, the credit ban, the uniform pricing

requirement and the minimum mark-up are hybrid restraints of trade subject to Sherman Act preemption. Also, we agree with the district court's conclusion that, under our decision in *Miller*, Washington's post-and-hold scheme is a hybrid restraint of trade that is subject to Sherman Act preemption.[22]

IV

[16] We finally consider whether the post-and-hold provisions of Washington's regulatory scheme which we have found to be subject to preemption may be otherwise saved by operation of the State's powers under the Twenty-first Amendment. Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory or possession of the United States for delivery or use

---

[22]As mentioned previously, we view the *Midcal* active supervision prong in this case as largely collapsing into *Fisher*'s hybrid/unilateral inquiry. *See supra* at II.B. We emphasize, however, that viewing the post-and-hold scheme through the active supervision prism does not help Washington. As we explained in reviewing Oregon's similar post-and-hold scheme in *Miller*, "Oregon 'neither establishes prices nor reviews the reasonableness of the price schedules . . . [nor does it] monitor market conditions or engage in any 'pointed reexamination' of the program." Oregon mandates the posting of prices to be charged by each wholesaler, but does not in any way review the reasonableness of the prices set. While the commission 'may reject any price posting which is in violation of any of its rules,' Rule 210(1)(b), the effect of that rule is simply to effectuate the price posting and the prohibitions on quantity discounts and transportation allowances. It does not provide for government establishment or review of the prices themselves . . . Oregon merely authorizes and enforces the disputed pricing practices." 813 F.2d at 1351 (quoting *Miller v. Or. Liquor Control Comm'n*, 688 F.2d 1222, 1225-26 (9th Cir. 1982)). We see no discernable difference in Washington: the State neither sets the prices (outside the minimum mark-up), nor reviews those prices for reasonableness; the State does not engage in any pointed reexamination of the program; nor does the fact that the LCB can reject price postings in any way satisfy *Midcal*'s requirement. Thus, even assuming that the hybrid and active supervision inquiries do not completely overlap in this case, our decision in *Miller* compels us to conclude that Washington cannot meet the active supervision prong of *Midcal*.

therein of intoxicating liquors in violation of the laws thereof, is hereby prohibited." U.S. CONST. amend. XXI, § 2. Although this Amendment "gives the States wide latitude to regulate the importation and distribution of liquor within their territories, . . . [i]t is well settled that the Twenty-First Amendment did not entirely remove state regulation of alcohol from the reach of the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 584 (1986) (citing *Midcal*, 445 U.S. at 107; *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984)).

In *Midcal*, the Supreme Court stressed that "important federal interests in liquor matters survived the ratification of the Twenty-first Amendment." 445 U.S. at 108. Because the Twenty-first Amendment and the Commerce Clause are both parts of the same Constitution, "each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Id.* at 109 (quoting *Hostetter v. Idlewild Liquor Corp.*, 377 U.S. 324, 332 (1964)). In this "pragmatic effort to harmonize state and federal powers," *id.*, the key question is "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 714 (1984).

The Twenty-first Amendment inquiry is three-fold. First, a reviewing court should "examine the expressed state interest and the closeness of that interest to those protected by the Twenty-first Amendment." *TFWS*, 242 F.3d at 213. Next, a reviewing court should inquire "whether, and to what extent, the regulatory scheme serves its stated purpose in promoting temperance." *Id.* In other words, "is the scheme effective?" *Id.* As our court stated in *Miller*, the answer to this question "may ultimately rest upon findings and conclusions having a large factual component." 813 F.2d at 1352. Finally, the court should balance Washington's identified interests (to the extent

that the interests are furthered by the regulatory scheme) against the established federal interest in promoting competition under the Sherman Act. *TFWS*, 242 F.3d at 213.

[17] We have no doubt that the district court correctly concluded that temperance was a valid and important interest of the State under the Twenty-first Amendment.[23]

We must therefore, as the Supreme Court instructed in *Midcal*, consider the fit between the State's interest and its regulation.[24] The district court acknowledged that "Washington has

---

[23]The State forcefully argues that it also has a compelling interest in the promotion of orderly markets. It cites the Supreme Court's statement in *North Dakota v. United States*, 495 U.S. 423, 432 (1990), that the two North Dakota regulations at issue, which were passed "[i]n the interest of promoting temperance, ensuring *orderly market conditions*, and raising revenue," fell within the State's core interests under the Twenty-first Amendment. It is not precisely clear, however, what "orderly markets" means in this context. *See Bainbridge v. Turner*, 311 F.3d 1104, 1115 (11th Cir. 2002) ("As for 'ensuring orderly markets,' we are not sure what that phrase means . . . ."). Indeed, at trial, there were different, competing definitions set forth by the State. *See Findings of Fact* at *7, ¶ 25 ("LCB member Vera Ing defined 'orderly distribution' as the 'three-tier system' and stated that orderly distribution 'would be the ability to supervise" and 'clearly articulated procedures.' Dr. Kenneth Casavant, an economist, defined 'orderly marketing' as 'asking the market to have the prices reflect the cost of production' and to have the market avoid 'gluts and scarcities.' "). Given the difficulty of defining this concept, we discern no clear error in the district court's conclusion that the restraints were minimally effective in promoting this interest.

[24]Initially, LCB defendants, WBWWA and numerous *amici* contend that to require any proof of effectiveness gives insufficient deference to the States' policy prerogatives. *See, e.g., Brief of the National Beer Wholesalers Association* at 12-14. We reject this argument because the Supreme Court, at least implicitly, has already rejected it. In both *Midcal* and *324 Liquor*, the two cases involving state restraints which were not directed at discrimination against out-of-state interests, the Supreme Court has required *some* degree of fit between the regulation and the goal. *See, e.g., Midcal*, 445 U.S. at 112-14 (requiring the state to substantiate its concerns to prevail against the undoubted federal interest in a competitive econ-

one of the lowest rates in the country for per capita ethanol consumption per drinker, even though Washington ranks well above the national average in terms of the percentage of the population who consume alcohol." *Findings of Fact* at *6, ¶ 18. However, it rejected this "moderation" as a basis for affording Twenty-first Amendment immunity because it found "no persuasive evidence" that the challenged restraints were the cause. *Id.* The court also noted that there was little empirical evidence documenting the relationship between such pricing schemes and consumption. *Id.* at *6, ¶¶ 19-20. Therefore, the district court was "not persuaded that the challenged restraints are effective in promoting temperance, whether viewed individually or as a whole." *Id.* at *6, ¶ 18.

**[18]** We cannot say that we are "left with the definite and firm conviction that a mistake has been committed" with respect to the district court's findings of fact; therefore, we conclude that they are not clearly erroneous. *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004). The State failed to demonstrate that its restraints are effective in promoting temperance; furthermore, as Costco's expert Michael Moore indicated, it is impossible to segregate the effects of the post-and-hold scheme from all the other polices adopted by Washington to influence alcohol consumption. *Findings of Fact* at *6, ¶ 21. We therefore agree with the district court with respect to the second part of the Twenty-first Amendment inquiry.

**[19]** In balancing the State's interest in promoting temperance with the federal interest in promoting competition under

---

omy); *324 Liquor*, 479 U.S. at 350 (following *Midcal* and requiring state to substantiate its interest). In addition, in *Miller*, we emphasized that the district court on remand would need to consider "the extent to which, in reality, the state rule serves its avowed purposes." 813 F.2d at 1352 n.7. Thus, the district court was correct in requiring the State of Washington to "substantiate" its interests by showing some degree of fit between its interests and its regulatory scheme.

the Sherman Act, we must keep in mind the extent to which the State's "interest is actually furthered by the regulatory scheme." *TFWS*, 242 F.3d at 213. Given that the State has failed to demonstrate that the post-and-hold requirement is effective in promoting temperance, we agree with the district court that "the state's interests do not outweigh the federal interest in promoting competition under the Sherman Act." *Findings of Fact* at *10.[25]

**[20]** Because the State failed to carry its burden on the Twenty-first Amendment defense, the post-and-hold scheme is not saved from preemption under the Sherman Act.

---

[25]Although we ultimately agree with the district court's conclusion, we are troubled by the district court's apparent application of a "narrow tailoring" test. *See Findings of Fact* at *7, ¶ 22 (noting that "[i]f the State desires to promote temperance by artificially increasing beer and wine prices, the State could readily achieve that goal in a manner that does not run afoul of the Sherman Act. Most obviously, the State could adopt higher excise taxes on beer and wine."); *see also id.* at *9, ¶ 34.

We do not agree that the existence of an alternative form of regulation necessarily means that the State's interest will yield to the federal interest in promoting competition. It is true that a "narrow tailoring" test may have some applicability in the case of blatant discrimination between in and out-of-state liquor interests, but it has never been applied in the context of balancing the states' core concerns with the principles of the Commerce Clause. *See Granholm*, 544 U.S. at 489 ("State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent. The instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers."); *id.* ("We still must consider whether either state regime 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' ") (internal citations omitted).

The district court's suggestion that the State should serve its interest in some other way disparages the policy choices that Section 2 of the Twenty-first Amendment commits to the states. There doubtless are varying reasons why the State has not opted for an excise tax, and as a federal court, we are not authorized to look behind the regulation to decide whether such policy reasons are sufficiently compelling.

## V

In conclusion, we reverse the judgment of the district court insofar as it held that most of Washington's restraints on the sale of beer and wine were hybrid restraints subject to pre-emption under the Sherman Act. We affirm the district court's rejection of Costco's challenge to the retailer-to-retailer sales ban. We also affirm its conclusion that under our precedents, the post-and-hold scheme is a hybrid restraint of trade that is not saved by the state immunity doctrine or the Twenty-first Amendment. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART.**